# FILED

MAR 2 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name __**LOSNO**_____**RAFAEL**_____**A**_____
　　　　　(Last)　　　　　　　　(First)　　　　　　　　(Initial)

Prisoner Number __C-73252_____

Institutional Address __SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94974__

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

CV 08 1572

**RAFAEL ALBERTO LOSNO**
_____
Full Name of Petitioner

Case No.(To be provided by the clerk of court)

(PR)

vs.

**Robert L. Ayers Warden,**
_____　　PETITION FOR A WRIT OF HABEAS CORPUS
　　Name of Respondent
　　(Warden or jailor)

Read Comments Carefully Before Filling In

### When and Where to File

　　You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

　　If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

**County of Commitment: San Mateo**

**County of Confinement: Marin**

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.  What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

| San Mateo County Superior Court | Redwood City |
|---|---|
| Court | Location |

(b) Case number, if known ___C10551___

(c) Date and terms of sentence ___1981 and resentenced in 1983___

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) (Yes)   No

Where?  San Quentin State Prison, San Quentin, CA 94974

(Name of Institution)                    (Address)

2.  For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Second Degree Murder

3.  Did you have any of the following?

Arraignment: Yes _X_ No ___ Preliminary Hearing: Yes _X_ No ___ Motion to Suppress: Yes ___ No ___

4.    How did you plead?

Guilty __X__    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) __Plea Bargain, no enhancements or special circumstances__

5.    If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __ No __

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment  Yes __        No __
(b)    Preliminary hearing        Yes __        No __
(c)    Time of plea  Yes __        No __
(d)    Trial  Yes __    No __
(e)    Sentencing  Yes __        No __
(f)    Appeal        Yes __        No
(g)    Other post-conviction proceeding    Yes __        No __

8.    Did you appeal your conviction?   Yes __ No __

(a)    If you did, to what court(s) did you appeal?

Court of Appeal    Yes __    No __    _____    _____
                                          (Year)                        (Result)

Supreme Court of
California        Yes __    No __    _____    _____
                                          (Year)                        (Result)

Any other court    Yes __    No __    _____    _____
                                          (Year)                        (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                        Yes __ No __

(c)    Was there an opinion?        Yes __  No __

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                  Yes __        No __

4

If you did, give the name of the court and the result:

---

9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes X    No __

California Superior Court, County of San Mateo: Petition for writ of habeas corpus same grounds as in instant petition.

California Court of Appeal, in and for the First Appellate District of California: Petition for writ of habeas corpus, same grounds as in instant petition.

California Supreme Court: Petition for Review, same grounds as in instant petition.

Court of Appeal, First Appellate District, Div. 3 - No. A119721
**S159364**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RAFAEL LOSNO on Habeas Corpus

The petition for review is denied.

George, C.J., and Corrigan, J., were absent and did not participate.

**SUPREME COURT**
**FILED**

FEB **2 7** 2008

**Frederick K. Ohlrich Clerk**

_____
**Deputy**

**BAXTER**
_____
Acting Chief Justice

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

**FILED**

DEC 1 1 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____
DEPUTY

| | |
|---|---|
| In re RAFAEL LOSNO,<br><br>on Habeas Corpus. | A119721<br><br>(San Mateo County<br>Super. Ct. Nos. SC-10551A;<br>HC-1943) |

THE COURT:*

The petition for a writ of habeas corpus is denied.

Dated: **DEC 1 1 2007**          McGUINESS, P.J. P.J.

_____

* McGuiness, P.J.& Horner, J. (Judge of the Alameda Super. Ct., assigned by the Chief
Justice pursuant to art. VI, § 6 of the Cal. Const.), participating. Pollak, J. dissents from
the decision to summarily deny the petition.

**POLLAK, J.**—Dissenting.

This is yet another case the ultimate outcome of which is dependent on resolution of the proper standard of review, an issue now pending before our Supreme Court. (*In re Lawrence,* review granted Sept. 19, 2007, S154018 [2007 Cal. Lexis 10073].) If no more is required to uphold the denial of parole than some evidence that the petitioner committed a horrible crime—i.e., one "in an especially heinous, atrocious, or cruel manner" (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1))—it may be that the record supports the determination of the Board of Parole Hearings (the Board) in this case.[1] If that is the standard, petitioner can be denied parole forever for the crime he committed more than 26 years ago, despite his subsequent undisputed salutory efforts at personal improvement and the low risk of recidivism he presents. However, if, as a growing number of cases have held, what is required is some competent evidence tending rationally to show that he "will pose an unreasonable risk of danger to society if released from prison" (Cal. Code Regs., tit. 15, § 2402, subd. (a)), the Board's finding of unsuitability clearly cannot be sustained.[2] (E.g., *In re Dannenberg* (Nov. 16, 2007, H030031) __Cal.App.4th __ [2007 Cal.App. Lexis 1865]; *In re Barker* (2007) 151 Cal.App.4th 346, 366; *In re Weider* (2006) 145 Cal.App.4th 570, 589; *In re Scott* (2005) 133 Cal.App.4th 573, 595.) What the Sixth Appellate District said in overturning the

---

[1] Even this is not entirely clear. The petitioner was one of several gang members who clubbed another youth to death—unquestionably a brutal and senseless crime. However, although the petitioner admittedly struck the victim, the record is inconclusive as to whether he did so only on the victim's leg or whether he also struck the victim on the head.

[2] Without taking the time to summarize petitioner's exemplary record while in prison and the favorable psychological evaluations he has received, it is perhaps sufficient to note that even the deputy district attorney who appeared before the Board indicated that his office took no position on petitioner's suitability for parole and that he "can't help be impressed with everything he's done since" commission of the single offense for which he has been imprisoned. (Petn., exh. A, p. 113.) The assistant district attorney did question whether petitioner was "being entirely forthright about what happened in the crime" (*ibid.*) some 26 years in the past, but before the Board petitioner did acknowledge that he "probably hit [the victim] in the head, too" (*id.* at p. 103).

1

Governor's denial of parole in *In re Dannenberg*, is equally applicable to the petitioner here: "It is not the mere passage of time that deprives [petitioner's] commitment offense of predictive value with respect to the risk he may pose to society. The quantity and quality of [petitioner's] consistent and spotless record of upstanding conduct for the last 20 years, coupled with the absence of any negative factors and the presence of every conceivable favorable factor, combine to eliminate any modicum of predictive value that his commitment offense once had. The record before the Board . . . lacks any support for the . . . conclusion that, due to the nature of his commitment offense, [petitioner] poses a current, unreasonable risk of danger to society if released." (*In re Dannenberg, supra*, __ Cal.App.4th __ [2007 Cal.App. Lexis 1865, at p. *25].)

In my view, these latter cases reflect the correct standard. There is absolutely no evidence that petitioner presents a significant risk of reoffending and he is therefore entitled to be released on parole.

POLLAK, J.

Pollak, J.

2

**FILED**
**SAN MATEO COUNTY**

OCT 2 2 2007

Clerk of the Superior Court

By _____ DEPUTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN MATEO

In re:

RAFAEL LOSNO

On Habeas Corpus.

)
)
)
)
)
)
)
)
)

Case No. SC-10551 A
            HC-1943

**ORDER OF DENIAL**

The Court has received and reviewed the Petition for Writ of Habeas Corpus filed by Petitioner, Rafael Losno on September 13, 2007. The petition is hereby denied.

In 1981, Petitioner entered a plea of nolo contendere to one count of second degree murder (PC § 187). He was subsequently sentenced to fifteen years to life in prison.

On December 18, 2006, the Board of Parole Hearings (BPH) denied parole for one year, ruling that Petitioner would pose an "unreasonable risk of danger to society or a threat to public safety if released from prison" based on the cruel and callous and dispassionate and calculated manner in which the crime was carried out (TX of 12/16/06 hearing at p. 119). The

1

1  15 year-old victim was beaten to death by three assailants,
2  including Petitioner, wielding baseball bats and a golf club
3  after he had fallen to the ground (Id. at pp. 119-121)   The
4  offense demonstrated an exceptionally callous disregard for
5  human suffering and the apparent motive, which involved an
6  exchange of gang epithets, was very trivial in relation to the
7  offense (Id. at p. 120).   Petitioner has thirty two 128(a)
8  counseling chronos and seven 115's (Id. at p. 121).   Petitioner
9  did have parole plans, but his important letters were outdated
10  and not specific enough (Id. at pp. 122-123.)   Though
11  Petitioner had a generally supportive psych report and
12  exceptional programming, there needed to be more insight into
13  his role in the commitment offense as well as his gang
14  affiliation inside the institution in the initial years (Id. at
15  pp. 121-125).   The Board noted that its decision was not easy,
16  but that the positive aspects of his behavior did not outweigh
17  the factors of unsuitability (Id. at p. 124).

18

19      Petitioner argues that the Board's decision lacked "some
20  evidence" as to the ultimate issue: that he would subject
21  society to an unreasonable risk of danger to public safety, and
22  that therefore it contravened his due process rights.   He also
23  argues that the Board should have analyzed his eligibility as
24  if he had been convicted of first degree murder, since he would
25  already have been eligible for parole had he been convicted of
26  first degree murder.

27

28

2

THE DECISION OF THE BOARD OF PRISON TERMS TO DENY PETITIONER A PAROLE RELEASE DATE WAS PROPER.

A petition for writ of habeas corpus is proper to challenge a denial of parole by the Board of Prison Terms. (In re Sena (2001) 94 Cal.App.4th 836, 840.)

> "…[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law. (See In re Ramirez, supra, 94 Cal.App.4th at p. 572; In re Bowers (1974) 40 Cal. App. 3d 359, 362, 114 Cal. Rptr. 665.)"

(In re Rosenkrantz (2002) 29 Cal.4th 616, 658.)

"[T]he gravity of the commitment offense or offenses alone may be a sufficient basis for denying a parole application, so long as the Board does not fail to consider other relevant factors." (In re Ramirez (2001) 94 Cal.App.4th 549, 569 overruled on other grounds in In re Dannenberg (2005) 34 Cal.4th 1061, 1100; citing In re Seabock (1983) 140 Cal.App.3d 29, 37-38.) "The Legislature has provided that the Board may refuse to set a parole release date if 'it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offenses, is

3

1 | such that consideration of the public safety requires a more
2 | lengthy period of incarceration.'  Pen. Code § 3041, subd. (b),
3 | italics added.)"  (Ramirez, supra, 94 Cal.App.4th at p. 569.)

5 | Based on a review of the information submitted by
6 | Petitioner, the BPH did not abuse its discretion when it denied
7 | Petitioner a parole release date in 2006.  The Board properly
8 | considered the gravity and circumstances of the commitment
9 | offense as provided for under California law.  Rather than
10 | systematically denying Petitioner parole, the Board considered
11 | the activities he participated in while he was incarcerated,
12 | his evaluations, and his institutional behavior, as provided in
13 | 15 CCR 2402.  After considering all of this information, as
14 | required, the board came to a decision that was proper as there
15 | was *some evidence* in the record to support it.  Having
16 | concluded that Petitioner was not suitable for parole by
17 | pointing to some evidence that the particular circumstances of
18 | his crime beyond the minimum elements of his conviction
19 | indicated exceptional callousness and cruelty, the Board was
20 | not required to compare Petitioner's crime to other second
21 | degree murders.  (See In re Dannenberg, supra, 34 Cal.4th at
22 | 1098.)

24 | Similarly, no binding authority required the Board to
25 | compare Petitioner's crime to a first degree murder, since the
26 | language quoted by Petitioner for this proposition came from
27 | Justice Moreno's *concurring opinion* in Rosenkrantz, supra, 29
28 | Cal.4th at p. 690.  The BPH not having abused its discretion in

4

its decision that Petitioner would pose an unreasonable risk of danger to society , this Court cannot order it to exercise its discretion differently.

**CONCLUSION**

When a petition for writ of habeas corpus fails to reveal sufficient facts which, if true, would establish a prima facie case for relief, summary denial is appropriate. (In re Clark (1993) 5 Cal.4th 750, 769.) For the foregoing reasons, the petition for writ of habeas corpus is hereby denied.

DATED: OCT 17 2007

John L. Grandsaert
Presiding Judge, Criminal

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court _California Superior Court, in and for San Mateo County._

Type of Proceeding _Habeas corpus petition._

Grounds raised (Be brief but specific):

a.    Same grounds as in instant petition.

b.

c.

d.

Result _Denied_                                    Date of Result **October 22, 2007**

II.    Name of Court _California Court of Appeal, Sixth District._

Type of Proceeding _Habeas Corpus Petition_

Grounds raised (Be brief but specific):

a.    Same as in instant petition.

b.

c.

d.

Result _Denied_                                    Date of Result **December 11, 2007**

III.    Name of Court _California Supreme Court_

6

Type of Proceeding _____ **Petition for Review, Habeas corpus petition.** _____

Grounds raised (Be brief but specific):

a. _____ Same as in instant petition. _____

b. _____

c. _____

d. _____

Result __ **Denied.** _____ Date of Result __ **February 27, 2008**

    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes __ No<sup>X</sup> __

_____

(Name and location of court)

## B. GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need more space. Answer the same questions for each claim.

    Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: _____ See Insert A, **PAGES LABLED A1 THROUGH A6**

### Ground 1

THE BOARD OF PAROLE HEARINGS VIOLATED PETITIONER'S STATE
AND FEDERAL DUE PROCESS WHEN IT DID NOT APPLY THE PROPER
CRITERIA AND ITS DECISION DENYING PETITIONER PAROLE WAS
NOT SUPPORTED BY SOME EVIDENCE.

**A. Due Process Requires That Some Evidence Support A Parole Denial**

On December 18, 2006, Petitioner was denied parole primarily on the

grounds of the May 15, 1981 crime being "carried out in a very cruel and

callous manner." (Exhibit A, December 18, 2006, Board Transcripts, p. 119.)

The record shows that Board ignored the avalanche of evidence of rehabilitation

in petitioner's institution record, wherein the Board deemed as "Truly

outstanding group participation, self-help groups, contributing to the outside

from the inside. A lot of self-development here in terms of the vocations

and education and outstanding." (Exhibit A, p. 125.)

A California prisoner with a sentence of a term of years to life with

the possibility of parole has a protected liberty interest in release on parole

and therefore a right to due process in the parole suitability proceedings.

See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987);

Greenholtz v. Inmate of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979);

Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirement of due process

if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting

some evidence standard for disciplinary hearings outlined in Superintendent

v. Hill, 472 U.S. 455, 454-55 (1985)). However, some evidence "must have some

indicia of reliability" (Scott I, supra, 119 Cal.App.4th at p. 899) and

"suitability determinations must have some rational basis in fact." (In re

Elkins, supra, 144 Cal.App.4th at p. 489.)

As the California Supreme Court has summarized it, "the judicial branch

is authorized review the factual basis of a decision of the Board denying

parole in order to ensure that the decision comports with the requirements

1.

INSERT A

of due process of law, but ... in conducting such a review, the court may inquire only whether **some evidence** in the record before the Board supports the decision to deny parole, based upon the factors specified by the statute and regulation. If the decision's consideration of the specified factors is not supported some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (In re Rosenkrantz, 29 Cal.4th at p. 658, emphasis added.)

In In re Sandra Lawrence, ___ Cal.App.4th ___, 2007 WL 1475283, the Court analyzed in historic detail the standard of review for California and federal due process. After reviewing: Rosenkrantz, Dannenberg, McQuillion, Sass, Biggs, and Irons, the Court concluded:

> Combining the California and federal standards of review, as they have been articulated thus far by the California Supreme Court and the Ninth Circuit, respectively, the commitment crime can lack the power to supply "some evidence" supporting a denial of parole because of the interplay between two factors - the nature of that crime and the passage of time since its commission. That is, the fact there is "some evidence" the crime was committed and committed a certain way at a certain time does not mean that crime necessarily represents "some evidence" the prisoner's release on parole will pose an unreasonable risk of danger to public safety at the present time. Whether it possesses the necessary predictive value depends both on the nature of the crime and how long ago it happened.

(In re Lawrence (2007) 150 Cal.App.4th 1511; see also In re Gray (2007) 151 Cal.App.4th 379; and In re Barker (2007) 151 Cal.App.4th 346.)

The Lawrence court also explained that "it is not just 'some evidence' to support the [Board's] findings, but 'some evidence' sufficient to satisfy the statute's ultimate test, that is, 'some evidence' the release of [Lawrence] would subject society to an 'unreasonable risk' of danger to public safety." (Id.)

2.

B.    The Board's December 2006 Decision Denying Petitioner Parole Based
on the Commitment Offense Was Not Supported by Some Evidence

    1.    The Circumstances of Petitioner's Commitment Offense Does Not
Support the Board's Parole Denial

    "The nature of the prisoner's offense, alone can constitute a sufficient

basis for denying parole." (Rosenkrantz, supra, 29 Cal.4th at p. 682, 128

Cal.Rptr.2d 104, 59 P.3d 174.) However, Chief Justice George noted in the next

paragraph, "In some circumstances, a denial of parole based upon the nature

of the offense alone might rise to the level of a due process violation - for

example where no circumstances of the offense reasonably could be considered

more aggravated or violent than the minimum necessary to sustain a conviction

for that offense... 'The Board's authority to make an exception [to the

requirement of setting a parole date] based on the gravity of a life term

inmate's current or past offenses should not operate so as to swallow the rule

that parole is "normally" to be granted.... [A] life term offense or any other

offenses underlying an indeterminate sentence must be particularly egregious

to justify the denial of a parole date.'" (Rosenkrantz, supra, 29 Cal.4th at

p. 683, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

    Petitioner was convicted of second degree murder and sentenced to a

term of 15 years-to-life with the possibility of parole. With custody credits,

at the time of his December 2006 hearing he had been in custody over 25 years,

over 15 years beyond his Minimum Eligible Parole Date. (Cal Code Regs. tit.

15, § 2403.) With good time credits, he has served a term of 37.5 years.

Accordingly, Petitioner is now being punished as if he had been convicted of

first degree murder with special circumstance.

    When a person convicted of second degree murder is being punished as

though the crime were first degree murder, then due process requires that

Board's findings of exceptionality must be based on a comparison to instances

3.

INSERT A

of first degree murder. (In re Weider (2006) 145 Cal.App.4th 570, 582-583.)

If a comparison to first degree murder was not required in these situations, absurdly, Petitioner would be better off if he had been convicted of second first murder, because then there would be no questioning that the same crime facts would have to be examined by the Board to see if the murder was especially heinous for a first degree murder, rather than a second degree murder. More logically, the crime must now be evaluated for exceptionality against the elements of first degree murder. As the Court in In re Rosenkrantz, 29 Cal.4th 616 (Cal. 2002) "....there will come a point, which already may have arrived, when Petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a first degree murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense. (See In re Ramirez (2001) 94 Cal.App.4th 549, 570-571 [114 Cal.Rptr.2d 381] (In re Rosenkrantz, supra, 690 [Cal. 2002].)

While the Supreme Court in In re Dannenberg (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] rejected the proposition that the Board must evaluate each case under standards of term uniformity, (Dannenberg, 34 Cal.4th 1061 at 1070 - 23 Cal.Rptr.3d at 420), it took nothing away from the Board's obligation to compare like crimes when trying to determine if the crime under review is exceptional. And to find that the facts of the crime render it exceptional, the criminal conduct must exceed the elements of the crime under review. The Supreme Court explained this in Dannenberg, (supra, at pp. 1094-1095.): "use of the phrase 'particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than minimally necessary to convict him of the offense for which he is confined." (Id. at

4.

p. 1095.) (See also In re Scott (2004) 119 Cal.App.4th 871, In re Smith (2003) 114 Cal.App.4th 343, 367, In re Smith (2003) 109 Cal.App.4th 489.)

In Rosenkrantz the Court observed vis-a-vis Rosenkrantz's commitment offense" "Other than felony murders, first degree murders by definition involve premeditation and deliberation. Moreover, Petitioner pled guilty to second degree murder. Therefore, petitioner's offense did not partake of any those characteristics that make an offense particularly egregious under the Board of Prison Term's parole eligibility matrix for first degree murder, e.g., torture, the infliction of severe trauma not involving immediate death, or murder for hire. (Cal. Code Regs., tit. 15, § 2403, subd. (b).) Nor is it certain that Petitioner's lack of remorse immediately following the crime, by itself, would make the crime exceptional compared to other first degree murders." In re Rosenkrantz, supra, 616, 690 (Cal. 2002).

Rosenkrantz here is particularly apropos to the case at bar. There was no evidence to prove first degree murder, otherwise, it is reasonable to assume, Petitioner would have been convicted of first degree murder. As Petitioner's crime facts are not sufficient to place the crime in the category of a first degree murder, these same facts cannot constitute "some evidence" of exceptionality for a first degree murder.

Nor is Petitioner's crime "exceptional" pursuant to Title 15, § 2402(C)1.

The ultimate directive to the Board by Penal Code § 3041; California Code of Regulations, Title 15, § 2400 and the decided cases, is to make a determination as to whether or not Petitioner would now pose an unreasonable risk of danger to society if he were to be released.

The focus is on present time. The "some evidence" upon which the Board may rely to deny parole must be evidence of a present danger of Petitioner

5.

INSERT A

committing a violent act against society if he is paroled.

In Thomas v. Brown, 2006 U.S. Dist. LEXIS 94460, 1-12 (D. Cal. 2006)
the court itself looked at the current psychological evaluation and emphasizing
the currency of the potential threat, faulted the Governor for relying on an
old psychological evaluation and ignoring a more current one. Thomas v. Brown,
supra, *24)

Similarly in Petitioner's case the Board ignored the evaluations of
(Exhibit B p. 5.)

Had the Board fairly and impartially reviewed the relevant and reliable
information available to it, rather then pick and chose that which most suited
its predetermination to deny parole and ignore the rest (Exhibit B), the Board
would have reached a different conclusion.

For the foregoing reasons, the Court should grant the petition, order
the Board to release Petitioner immediately, and apply any custody credits
that go beyond his calculated term toward his maximum three year parole period.
(See In re Ernest Smith, DJDAR 6217.)

Supporting Facts: _____

_____

_____

_____

Claim Two: _____

_____

Supporting Facts: _____

_____

_____

_____

Claim Three: _____

_____

Supporting Facts: _____

_____

_____

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____

_____

_____

8

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

Do you have an attorney for this petition?    Yes ___  No **X**  **Petitioner request cousel due to the complexity of this case..**

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on __March 12, 2008__        _____
             Date                Signature of Petitioner

( rev. 5/96)

9

CV  08                    1572

EXHIBIT    "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In·the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number C-73252
                          )
RAFAEL LOSNO              )
                          )
_____)


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

DECEMBER 18, 2006

1:36 P.M.


PANEL PRESENT:

JANICE ENG, Presiding Commissioner
DEBORAH STAR, Deputy Commissioner


OTHERS PRESENT:

RAFAEL LOSNO, Inmate
PAT FOX, Attorney for Inmate
RICK GOOD, Deputy District Attorney
CORRECTIONAL OFFICERS UNIDENTIFIED


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum


Anna E. McGaughy              House of Scribes

ii

INDEX

|                                |      | PAGE |
|--------------------------------|------|------|
| Proceedings                    | . . . | 1    |
| Case Factors.                  | . . . | 9    |
| Pre-Commitment Factors.        | . . . | 35   |
| Post-Commitment Factors        | . . . | 50   |
| Parole Plans.                  | . . . | 75   |
| Closing Statements.            | . . . | 113  |
| Recess.                        | . . . | 118  |
| Decision.                      | . . . | 119  |
| Adjournment                    | . . . | 126  |
| Transcriber Certification      | . . . | 127  |

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER STAR:**  Okay.  We're on

3   record.

4          **PRESIDING COMMISSIONER ENG:**  Okay.  Good

5   afternoon.  This is a Subsequent Parole Consideration

6   Hearing for Rafael Losno, L-O-S-N-O, first name

7   R-A-F-A-E-L; CDC Number C-73252.  Today's date is

8   December 18, 2006 and the time is 1:36 in the

9   afternoon.  We are located at San Quentin State

10  Prison.  The inmate was received on September 23, 1983

11  from San Mateo County.  The life term began on

12  September 23, 1983.  Minimum eligible parole date is

13  September 16, 1993.  The controlling offense for which

14  the inmate has been committed is Murder, Second; Case

15  Number C-10551, Count One, Penal Code 187.  The inmate

16  received a total term of 15 years to life.  This

17  hearing is being tape-recorded so for the purpose of

18  voice identification, each of us will be required to

19  state our first and last names, spelling out our last

20  name.  And sir, when it comes to your turn, after you

21  spell out your last name, please provide us with your

22  CDC number.  So I'll begin and we'll move to my left.

23  My name is Janice Eng, E-N-G, Commissioner.

24         **DEPUTY COMMISSIONER STAR:**  Deborah Star,

25  S-T-A-R, Deputy Commissioner.

26         **DEPUTY DISTRICT ATTORNEY GOOD:**  My name is

27  Rick Good, G-O-O-D, Deputy District Attorney, San

2

1    Mateo County.

2          **ATTORNEY FOX:**  Pat Fox, F-O-X, Attorney for
3    Mr. Losno.

4          **INMATE LOSNO:** Rafael Losno, L-O-S-N-O,
5    C-73252.

6          **PRESIDING COMMISSIONER ENG:**  Thank you.  And
7    for the record, we have two correctional officers
8    present for security reasons and they will not be
9    participating in the hearing.  Before we begin, sir,
10   you will be required to read aloud the ADA Statement
11   in front of you so you can start anytime.

12         **INMATE LOSNO:**  ADA Statement?  "The
13             Americans With Disabilities Act, ADA, is a
14             law to help people with disabilities.
15             Disabilities are problems that make it
16             harder for some people to see, hear, read,
17             talk, walk, learn, think, work and take care
18             of themselves than it is for others.  Nobody
19             can be kept out of public places or
20             activities because of a disability.  If you
21             have a disability, you have the right to ask
22             for help to get ready for your BPT hearing,
23             get to the hearing, talk, read forms and
24             papers and understand the hearing process.
25             BPT will look at what you ask for to make
26             sure that you have a disability that is
27             covered by the ADA and that you have asked

```
1              for the right kind of help.  If you do not
2              get help or if you don't think you got the
3              kind of help you need, ask for BPT 1074
4              Grievance Form.  You can also get help to
5              fill it out.
```

6        **PRESIDING COMMISSIONER ENG:**  Okay, thank
7   you.  The record reflects that you did sign the BPT
8   Form 1073 on July 28 of 2006 and this form is a
9   Reasonable Accommodation Notice and Request, in
10  accordance with the provisions of the Americans With
11  Disabilities Act.  And it does indicate that you do
12  not have any disabilities, as defined under the ADA.
13  Is that true?

14       **INMATE LOSNO:**  Yes.

15       **PRESIDING COMMISSIONER ENG:**  Okay.  So this
16  information is still current and correct?

17       **INMATE LOSNO:**  Yes.

18       **PRESIDING COMMISSIONER ENG:**  Okay, good.  I
19  still have to go through some of these questions with
20  you.  Do you have any problems walking up and down
21  stairs or for distances of 100 yards or more?

22       **INMATE LOSNO:**  No.

23       **PRESIDING COMMISSIONER ENG:**  Okay.  And do
24  you need any glasses or magnifying devices in order to
25  read any documents?

26       **INMATE LOSNO:**  No, not yet.

27       **PRESIDING COMMISSIONER ENG:**  So you'll be

4

1   fine today; right?

2          **INMATE LOSNO:**  Yes.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  But if

4   you do have a problem, just let us know.  Do you have

5   any hearing impairments?

6          **INMATE LOSNO:**  No.

7          **PRESIDING COMMISSIONER ENG:**  Okay.  Have you

8   ever been included in the Triple CMS or the EOP

9   Programs?

10         **INMATE LOSNO:**  No, ma'am.

11         **PRESIDING COMMISSIONER ENG:**  And you know

12  what those are?

13         **INMATE LOSNO:**  Yes, I do.

14         **PRESIDING COMMISSIONER ENG:**  Okay.  Have you

15  ever taken any psychotropic medication, either in

16  prison or in the streets?

17         **INMATE LOSNO:**  No.

18         **PRESIDING COMMISSIONER ENG:**  Okay.  And how

19  far did you get in school, sir?

20         **INMATE LOSNO:**  Junior year in high school.

21         **PRESIDING COMMISSIONER ENG:**  Okay.  And have

22  you ever taken any Special Ed classes while you were

23  in school?

24         **INMATE LOSNO:**  I did continuation at that

25  time so I could try to graduate.

26         **PRESIDING COMMISSIONER ENG:**  But you didn't

27  have like Special Education classes while you were,

5

1    like, going in grade school or high school?

2           **INMATE LOSNO:**  No, ma'am.  Not that I can
3    remember.

4           **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.
5    Do you suffer from any disability that would prevent
6    you from participating in today's hearing?

7           **INMATE LOSNO:**  No.

8           **PRESIDING COMMISSIONER ENG:**  Counsel, are
9    there any ADA issues that you believe need further
10   discussion regarding your client's ability to fully
11   participate in the hearing today?

12          **ATTORNEY FOX:**  No.  I think he'll be very
13   well able to participate.

14          **PRESIDING COMMISSIONER ENG:**  Okay, fine.
15   This hearing is being conducted pursuant to the Penal
16   Code and the rules and regulations of the Board of
17   Parole Hearings governing parole consideration
18   hearings for life inmates.  The purpose of today's
19   hearing is to once again consider your suitability for
20   parole.  And in doing so, we'll consider the number
21   and nature of the crimes for which you were committed,
22   your prior criminal and social history, your behavior
23   and programming since your commitment and your plans
24   if released.  We've had the opportunity to review your
25   central file and you will be given the opportunity to
26   correct or clarify the record.  We will consider your
27   progress since your commitment, your counselor's

6

1    reports and your mental health evaluations.  We will

2    focus on your progress and any new reports since your

3    last hearing so any changes in parole plans should be

4    brought to our attention.  We will reach a decision

5    today and inform you whether or not we find you

6    suitable for parole and the reasons for our decision.

7    So if you are found suitable for parole, the length of

8    your confinement will be fully explained to you at

9    that time.  Before we recess for deliberations, the

10   District Attorney's representative, who is present,

11   your attorney and you yourself will be given an

12   opportunity to make a final statement regarding your

13   parole suitability.  So just remember that your

14   statement should be limited to why you feel you are

15   suitable for parole.  We'll then recess, clear the

16   room and deliberate.  Once we've completed our

17   deliberations, we'll resume the hearing and announce

18   our decisions.  California Code of Regulations states

19   that regardless of time served, a life inmate shall be

20   found unsuitable for and denied parole if, in the

21   judgment of the Panel, the inmate would pose an

22   unreasonable risk of danger to society if released

23   from prison.  You have certain rights.  Those rights

24   include; the right to a timely notice of this hearing,

25   the right to review your central file and the right to

26   present relevant documents.  Counselor, have your

27   client's rights been met?

7

1          **ATTORNEY FOX:**  Yes, as to this hearing.

2          **PRESIDING COMMISSIONER ENG:**  Okay.  But you

3   have an additional right to be heard by an impartial

4   Panel.  You've been introduced to this Panel.  Do you

5   have any objections to it?

6          **INMATE LOSNO:**  No.

7          **PRESIDING COMMISSIONER ENG:**  Okay.

8   Counselor, any objections?

9          **ATTORNEY FOX:**  No, no objection.  Thank you.

10         **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, you

11  will receive a copy of our written, tentative Decision

12  today and that Decision becomes final within 120 days.

13  So a copy of the Decision and a copy of the transcript

14  will be sent to you.  On May 1, 2004, the regulations

15  regarding your right to appeal a Decision made at this

16  hearing were repealed.  The current policy is entitled

17  Administrative Appeals, Correspondence and Grievances

18  Concerning Board of Prison Term Decisions.  So you can

19  consult with your attorney if you have any questions

20  about it or you can review the policy at the prison

21  law library.  You're not required to admit to or

22  discuss your offense.  However, this Panel does accept

23  as true the findings of the court.  Do you understand

24  what that means?

25         **INMATE LOSNO:**  Yes.

26         **PRESIDING COMMISSIONER ENG:**  Commissioner,

27  is there any confidential material in the files that

8

1   will be used today?

2       **DEPUTY COMMISSIONER STAR:**   There's

3   confidential information but we will not be using it

4   today.

5       **PRESIDING COMMISSIONER ENG:**   All right,

6   fine.   Okay.   I've already passed the Hearing

7   Checklist to your attorney, as well as to the District

8   Attorney's representative and we've each signed off on

9   it.   And the reason why we do this is to make sure

10  that we're all operating off of the same set of

11  documents for the hearing.   Okay.   So that is marked

12  Exhibit 1.   Okay.   Counselor, were there any

13  additional documents to be submitted today?

14      **ATTORNEY FOX:**   Not that we haven't already

15  submitted a little earlier today, including a couple

16  of certificates and a number of letters of support.

17      **PRESIDING COMMISSIONER ENG:**   Right.   I have

18  all these letters and I also have --

19      **ATTORNEY FOX:**   And the parole plans.

20      **PRESIDING COMMISSIONER ENG:**   -- Mr. Losno's

21  parole -- 2006 parole plans.

22      **ATTORNEY FOX:**   Yes.

23      **PRESIDING COMMISSIONER ENG:**   And then the

24  certificates.   Okay.

25      **ATTORNEY FOX:**   Thank you.

26      **PRESIDING COMMISSIONER ENG:**   Do you have any

27  preliminary objections?

9

1          **ATTORNEY FOX:**  No, thank you.

2          **PRESIDING COMMISSIONER ENG:**  Okay.  And will

3   your client be speaking with the Panel today?

4          **ATTORNEY FOX:**  Yes, (indiscernible).

5          **PRESIDING COMMISSIONER ENG:**  Okay.  On all

6   matters?

7          **ATTORNEY FOX:**  Yes.

8          **PRESIDING COMMISSIONER ENG:**  Okay.  Sir,

9   I'll have to swear you in them.  Please raise your

10  right hand.  Okay.  Do you solemnly swear or affirm

11  that the testimony you give at this hearing will be

12  the truth, the whole truth and nothing but the truth?

13         **INMATE LOSNO:**  Yes.

14         **PRESIDING COMMISSIONER ENG:**  Okay.  So we're

15  going to move on and what I'm going to do is read into

16  the record the Statement of Facts and I'm going to

17  take that from the Probation Officer's Report, page

18  two.  Each of us should have that in the Board packet

19  under legal documents for the present offense.

20              "Records of the (indiscernible) Police

21              Department indicate that on June 5, 1981,

22              officers responded to the scene of a fight

23              with serious injuries sustained.  Arriving

24              at the scene, they discovered a 15-year-old

25              victim that had been seriously wounded with

26              blows to his head, caused by baseball bats

27              and golf clubs.  Additionally, a witness at

10

1          the scene had been attacked by baseball bats
2          by two of the participants, when they
3          attempted to intervene.  The officers were
4          able to ascertain that two young, Latin
5          males had been in the vicinity of a
6          neighborhood grocery store when they were
7          attacked by four Latin males that had exited
8          a car that had stopped in the parking lot.
9          One of the young males in the area had been
10         fortunate in running into the store, while
11         the other youth, the ultimate victim, had
12         tripped and fallen in the parking lot.  When
13         he tripped, two of the males from the
14         automobile swung at him with baseball bats
15         and golf clubs, causing immediate serious
16         injury that resulted in his death three days
17         later.  The victim never regained
18         consciousness while in the hospital,
19         preceding his death.  Further investigation
20         of this matter disclosed the identity of at
21         least one participant, which led to the
22         arrest of all four members of the gang.  It
23         was then discovered that the four
24         participants in the attack were members of
25         the Little Park Street Gang out of the San
26         Francisco Mission District and the victim
27         was a reported member of a Daily City Youth

11

```
 1          Gang.   The Defendant and his co-attackers
 2          have stated they had met with other members
 3          of the Daily City Gang early in the day and
 4          had chased them from the scene using
 5          baseball bats.   When they came up on the two
 6          youths in the parking lot and through
 7          identification established by dress,
 8          gestures and attitudes, identified the
 9          victim and his friend as Daily City Street
10          Gang members.   Apparently, one member of the
11          (indiscernible) youths employed the driver,
12          Bustamonte, to stop the vehicle and" -- did
13          I miss something?   No.   "To stop the vehicle
14          and 'let's get him,' was stated to the
15          others.   They then all exited the vehicle
16          and this Defendant Losno, L-O-S-N-O, along
17          with the oldest member of the gang, chased
18          the victim, striking him in the head with
19          baseball bats and gold clubs.   The driver of
20          the vehicle, Bustamonte,
21          B-U-S-T-A-M-O-N-T-E, and the youngest member
22          of the gang, a juvenile, attacked a witness
23          who was attempting to intercede in the
24          attack.   And that witness also suffered
25          injuries from being struck by baseball bats.
26          Fortunately, his injuries were not of a very
27          serious nature.   An autopsy report performed
```

12

1           on the victim disclosed the cause of death
2           was serious injuries to the head caused by a
3           baseball bat and golf clubs.  This
4           Defendant, Losno, admits to having struck
5           the victim with a baseball bat but denies
6           hitting him in the area of his head.  Most
7           members of the gang were interviewed by
8           police officers, tended to identify the
9           oldest member of the gang, Richard Garcia,
10          G-A-R-C-I-A, as the person instigating the
11          attack and using the golf club, which may
12          have been the killing blow."
13   Do you have anything to add to that, Mr. Losno?
14          INMATE LOSNO:  What you just read?
15          PRESIDING COMMISSIONER ENG:  Yeah.
16          INMATE LOSNO:  You want me to explain what
17   happened that day?
18          PRESIDING COMMISSIONER ENG:  Yes.
19          INMATE LOSNO:  Well, it's true what --
20   everything the report says here.  That morning didn't
21   start off with the intentions to do that.  That
22   morning started off -- it was an innocent morning,
23   really.  An uncle of mine had came over to the house
24   and he asked me to come and go pay a cable bill in
25   that area in Daily City.  He lived in Daily City at
26   the time.  I did accompany him and at the time, my
27   girlfriend who was pregnant at the time, he was

13

1    speaking to me about what I'm about to face, the

2    responsibilities with my girlfriend. He gave me some

3    fatherly advice. He gave me some money

4    (indiscernible) that day. And when we returned back

5    to my house, the carload of the guys you just

6    mentioned right here were -- came to my house.  It was

7    a gang, the Little Park Gang at that time and I did

8    associate with this group of people at that time.

9    Although I had distanced myself and dropped out of

10   that gang with these guys for a while, I still knew

11   them so I would see them when I'd go down to San

12   Francisco. They also lived in Daily City.  They

13   offered me a ride to my girlfriend's house, who also

14   -- we all lived in Daily City.

15            PRESIDING COMMISSIONER ENG:  Yes, but you

16   weren't a member of the Daily City (indiscernible)

17   Gang?

18            INMATE LOSNO:  No.  The Daily -- that's

19   Fogtown.  I guess it was printed.  It's Fogtown and

20   it's a gang called Daily City.

21            PRESIDING COMMISSIONER ENG:  Okay. But you

22   were living in Daily City but not a member of that

23   gang?

24            INMATE LOSNO:  No.  No.

25            PRESIDING COMMISSIONER ENG:  You were

26   affiliated with a gang out of San Francisco?

27            INMATE LOSNO:  San Francisco, yes.  And

14

1   Richard Garcia and Bustamonte and the people you

2   mentioned, we all lived in Daily City by the bar

3   station at that time, all in that area.

4           **PRESIDING COMMISSIONER ENG:**  Well, how was

5   it that you were part of the San Francisco gang?

6           **INMATE LOSNO:**  My mom lived in San Mateo

7   County, which is Daily City.

8           **PRESIDING COMMISSIONER ENG:**  Um-hum.

9           **INMATE LOSNO:**  I was born and raised in San

10  Francisco so the majority of the time, I went down to

11  San Francisco and I've got family in San Francisco.

12  And the reason why we were on our way to San

13  Francisco, we had a early doctor's appointment at the

14  hospital with my girlfriend, who was pregnant.  We

15  were going down for family planning, a teen planning

16  appointment.  And the whole purpose of going to San

17  Francisco that day was because I was going through the

18  steps of cutting the umbilical cord and going through

19  all that family planning.

20          **PRESIDING COMMISSIONER ENG:**  Um-hum.

21          **INMATE LOSNO:**  So from -- we left my house

22  and he offered to give me a ride to Maria's house, who

23  lived by Jefferson High School, which is right there

24  in the heart of where all this really transpired.

25  They waited for me as I went to go pick up Maria and

26  then they offered me a ride to San Francisco.  On the

27  way down to San Francisco, we decided to party on the

15

1   way down.  They were drinking beers and all that kind
2   of stuff.  As we get to San Francisco General
3   Hospital, I drop off Maria and I continue to talk to
4   these guys.  I didn't hang around with them but I knew
5   them.

6           **PRESIDING COMMISSIONER ENG:**  Okay.

7           **INMATE LOSNO:** At that time, if I would have
8   known how to make my decisions up to say no, I'll stop
9   hanging around with these guys, I would have done
10  that.  I just didn't know how to really break away
11  from these guys to not make them look at me as some
12  type of, you know, wuss or punk.  That I didn't hang
13  around with these guys no more because I had washed my
14  hands with the Little Park Gang.  So the thing was,
15  that in order to keep some type of communication, I
16  would speak to them so that's why I accepted the free
17  ride.  So down to -- on the way down to the city we
18  dropped Maria off.  We decided to park in the parking
19  lot.  We drunk some beers there and took a ride.
20  Another area of San Francisco, the neighborhood that I
21  was raised in (indiscernible).  We consumed some more
22  beer.  They dropped me back off at the hospital and I
23  spent the rest of the day with Maria at the hospital.
24  After we finished our appointment there, they leave
25  and me and Maria were on our own, leaving General
26  Hospital and we were going back towards Mission Street
27  to wait for the bus to go back to Daily City.  So

16

1   after the whole afternoon down there on 24th and

2   Mission where the buses pass by constantly -- the

3   (indiscernible) Mission. I still remember the 12

4   Ocean bus. On a summer day, June 5, I wanted to get

5   on the bus and a lot of guys who also were raised in

6   the area see me so we decided to start walking. And

7   instead of catching the bus, I ended up staying there

8   a little longer speaking to these guys and the hours

9   just progressed.

10          **PRESIDING COMMISSIONER ENG:**  With Maria?

11          **INMATE LOSNO:**  With Maria there, too.  They

12   know Maria, also. We all from there. We all hung out

13   in the area. It's a busy street, like the strip with

14   the low-rider happening back then and all that.

15          **PRESIDING COMMISSIONER ENG:**  Right.

16          **INMATE LOSNO:**  So now when I want to get on

17   the bus, a lot of girls see Maria. They come down to

18   the school area as they come out there and they see

19   Maria and they all look at you. Girl talk -- she's

20   pregnant, more time went by. So finally as the bus

21   coming by, we decided to ignore the bus and these guys

22   are driving around. Spanky and Chino and Garcia;

23   they're all driving around in the car, driving around

24   the neighborhood and they kept on offering me rides

25   back to Daily City. We were like no, we're okay.

26   We're waiting for the bus. The hours continued and

27   finally it got a little later and when they asked me

17

1    one more time, "Hey, we're going to Daily City.  Want
2    a ride?"  I decided to accept the ride and we get into
3    the car with Maria.  On the way back towards Daily
4    City that's when all this -- the unfortunately
5    inevitable happened.  It wasn't meant on purpose.  He
6    wasn't singled out to be killed how he was.  But on
7    the way up, I was hoping -- because the street -- you
8    can get on the freeway on 30th and Mission.  You can
9    get on the San Jose entrance to the freeway.  We
10   usually get off at Eastmore Avenue and he can just
11   drop me off.  That day, he decided to take the old
12   road so he drove Mission all the way up through the
13   back streets, all the way going up towards -- up
14   Mission (indiscernible).

15           **PRESIDING COMMISSIONER ENG:**  How many of you
16   were in the car at this point?

17           **INMATE LOSNO:**  It was Maria, myself,
18   Oscar Bustamonte, Richard Garcia, his brother and
19   another guy in the back seat.  I don't know his name.
20   His name was Angel; that's what they called him.  He
21   never got out of the car.  He stood in the back seat.
22   He stood in the car.

23           **PRESIDING COMMISSIONER ENG:**  The other guy?
24           **INMATE LOSNO:**  Yeah, the other guy.  He
25   never got out.

26           **PRESIDING COMMISSIONER ENG:**  Was he an
27   active gang member?

18

1          **INMATE LOSNO:**  He was in the gang.  He just
2    didn't get out of the car that day.
3          **PRESIDING COMMISSIONER ENG:**  But you did.
4          **INMATE LOSNO:**  Yeah, I was the idiot that
5    followed the -- followed.
6          **PRESIDING COMMISSIONER ENG:**  Yeah.  Before
7    we get any further, let me ask you something.  The
8    impression you give me is that you weren't an official
9    member of the gang.  Or were you?
10          **INMATE LOSNO:**  No, I used to run with them.
11          **PRESIDING COMMISSIONER ENG:**  Okay.
12          **INMATE LOSNO:**  I used to hang around with
13    them and I had dropped out.
14          **PRESIDING COMMISSIONER ENG:**  Okay.  And when
15    did you start running with the gang?  How old were
16    you?
17          **INMATE LOSNO:**  Eighteen.
18          **PRESIDING COMMISSIONER ENG:**  Well, you were
19    19, weren't you, at the -- you were 19 years old for
20    the life crime?
21          **INMATE LOSNO:**  I had just turned 19.  I
22    barely started hanging around with this group.
23          **PRESIDING COMMISSIONER ENG:**  You started
24    hanging around with them while you were living in
25    Daily City.  You had long left San Francisco; correct?
26          **INMATE LOSNO:**  No.  I would hang out in San
27    Francisco.  These are guys from --

19

1        **PRESIDING COMMISSIONER ENG:** But you weren't
2    living in San Francisco when you started hanging
3    around with them?

4        **INMATE LOSNO:** No. No, I was living with my
5    dad.

6        **PRESIDING COMMISSIONER ENG:** Had you ever --
7    when you were part of this gang during this time, what
8    types of illegal activities did you guys do? I mean,
9    was there any violence? Was there, you know, guns and
10   drive-by shootings or anything like that?

11       **INMATE LOSNO:** I never did experience --
12   this was all fairly new. It was (indiscernible) or
13   when the low-rider movement, as far as the
14   (indiscernible), you know. Low-riders just getting
15   started, you could say.

16       **PRESIDING COMMISSIONER ENG:** Um-hum. Okay.

17       **INMATE LOSNO:** And I just -- you know,
18   that's the neighborhood that we all grew up with and
19   we'd all hang on 24th. And it's such a big area where
20   a lot of guys don't really hang with each other
21   because they've got -- sometimes they say the squares.

22       **PRESIDING COMMISSIONER ENG:** Um-hum.

23       **INMATE LOSNO:** We'd carry (indiscernible)
24   and go to (indiscernible) and the other guys were hip
25   and they looked more like the troublemakers, you know.
26   And I'd try to pacify both groups because I was raised
27   on 17th and Mission and I know everybody there. So I'd

1   try to pacify both groups.  And instead of hanging
2   around with the square group, I ended up hanging
3   around with these guys a little bit more.  I was
4   working at the time at Candlestick Park and as I
5   started getting more of an idea of where this was
6   heading, before it got there, at least through the --
7   before it got really crazy with the rest of these
8   guys, that's when I started thinking.  I said, you
9   know what?  I'm going to drop out of this.  And they
10  was just -- only there was seven of us and I washed my
11  hands of them but I still knew the guys.

12          **PRESIDING COMMISSIONER ENG:**  Right.

13          **INMATE LOSNO:**  So when I would see them it
14  was how you doing?  You want a drink?  Okay, we'll
15  drink a few beers.  But little by little -- they used
16  to tease me, would you rather be with her, you're
17  wussed up.  I'd say I'd rather be with her to know
18  where I'm going, either her house or my house
19  (indiscernible).  The illegal activities were drinking
20  and hanging out at the pool halls or at the swimming
21  pool in the Mission District.

22          **PRESIDING COMMISSIONER ENG:**  So that was
23  back around the late seventies and early eighties?

24          **INMATE LOSNO:**  The early eighties.

25          **PRESIDING COMMISSIONER ENG:**  Were they
26  dealing in drugs at that time?

27          **INMATE LOSNO:**  We didn't.  We smoked weed.

21

1   We did all that.

2          PRESIDING COMMISSIONER ENG:  Right.  But

3   there wasn't like heavy dealing and --

4          INMATE LOSNO:  No, ma'am.

5          PRESIDING COMMISSIONER ENG:  Was there --

6   did -- were gang members carrying guns and stuff like

7   that?

8          INMATE LOSNO:  Well, I'm sure they was but I

9   didn't carry.

10         PRESIDING COMMISSIONER ENG:  Right.

11         INMATE LOSNO:  And the group that I was

12  with, the first or the main seven or eight guys who I

13  really associated with.

14         PRESIDING COMMISSIONER ENG:  Um-hum.

15         INMATE LOSNO:  It was mostly for girls.

16         PRESIDING COMMISSIONER ENG:  But this group

17  that you happened to be with on that day, did any of

18  them typically have weapons on them, that you can

19  recall?

20         INMATE LOSNO:  The older guy, Garcia --

21  Richard Garcia, he had just paroled out of prison.

22         PRESIDING COMMISSIONER ENG:  Okay.

23         INMATE LOSNO:  And to a lot of guys, he was

24  like --

25         PRESIDING COMMISSIONER ENG:  They looked up

26  to him?

27         INMATE LOSNO:  Yeah.  And he wasn't a big

22

1    guy in stature.

2          **PRESIDING COMMISSIONER ENG:**  Yeah.

3          **INMATE LOSNO:**  And I wasn't sort of speaking
4    impressed by him as far as because he's some little
5    guy but he was older.  He (indiscernible) and came out
6    of prison and he -- people looked up to him.  I was
7    bigger than him because at that time I was still in
8    school.  I played a lot of sports.  I was bigger than
9    him so -- he (indiscernible), I'm sure, you know, he
10   was the guy that would kind of make you want to prove
11   yourself and say you know what?  You're not that cool.
12   And me and my stupid thinking was, I'm going to prove
13   myself.

14         **PRESIDING COMMISSIONER ENG:**  What was Garcia
15   in jail for?

16         **INMATE LOSNO:**  Oh, I don't know.  I had just
17   met him --

18         **PRESIDING COMMISSIONER ENG:**  Okay.

19         **INMATE LOSNO:**  -- maybe a week, two weeks.
20   Because I never met him.  I didn't know him very long,
21   him or his brother.

22         **PRESIDING COMMISSIONER ENG:**  Is Garcia the
23   one that was armed with the baseball bat?

24         **INMATE LOSNO:**  I had the bat.

25         **PRESIDING COMMISSIONER ENG:**  You had the bat
26   and who had the golf club?

27         **INMATE LOSNO:**  He had the golf club.

23

1      **INMATE LOSNO:**  It was Garcia?  Okay.  I

2  still wonder and try to explain to me, what possessed

3  you to get out of the car?  Did you have a beef, a

4  personal beef?  Did you have something against this,

5  the Daily City Gang?

6      **INMATE LOSNO:**  Well, before that happened I

7  lived on St. Michael's Court in Daily City

8  (indiscernible) high school, Westmore (phonetic) High

9  School.  And there were times when I didn't have any

10  beef with none of these guys but at that time, they

11  were making a name for themselves, too.  They didn't

12  really like guys from San Francisco and my girlfriend

13  was from Daily City and she lived right in the heart

14  of Jefferson High School.  So I would go down there to

15  pick up Maria and it was always that SFM -- they

16  called it San Francisco (phonetic).  And it was the

17  only (indiscernible).  At times I even had a pet

18  poodle so maybe it was the dog.  Everyone had a pet

19  poodle.  That was the big thing, to show up with a

20  dog.  And so I didn't have confrontations with them

21  per se, but the older guys -- I looked a lot older

22  than I was.  And a lot of the guys the majority of the

23  time was, they'd throw something at me, you know, beer

24  bottles.  There was times when I would walk home from

25  Daily City.  The top of the hill in Daily City, all

26  the way up the overpass and there was times when I'd

27  walk across the street they would chase me in a white

24

1  station wagons or vans and I'd have to run.  So there
2  were times I'd get (indiscernible) because I was
3  treated in such a way.  They didn't know me just
4  because I was from San Francisco and the Mission
5  District.  They'd seen me down on the strip.  That's
6  what -- that's the only thing that really could get
7  me, as far as my holding a grudge because they were
8  chasing me.

9      PRESIDING COMMISSIONER ENG:  Had you ever
10  seen this -- the victim, Jorge Ruiz (phonetic) before?
11      INMATE LOSNO:  I'd never met him.  I never
12  knew him.  The only thing I've met -- I knew of him --
13      PRESIDING COMMISSIONER ENG:  You just saw
14  him in the parking lot that day?

15      INMATE LOSNO:  He was standing in the
16  parking lot with some other guy and they were smoking
17  a joint.  I remember that very, very clearly.

18      PRESIDING COMMISSIONER ENG:  Okay.

19      INMATE LOSNO:  And we were at a stop sign --
20  at a stoplight.  And I remember we looked at a 7-11
21  because we had a 7-11.  I was sitting in the back with
22  Maria and I remember we stopped at the red light and
23  looked out the window.  And it was on the FT, Fogtown
24  on (indiscernible), hand signs.  The guys in the car
25  were throwing back the San Francisco signs, all of us,
26  and there was more words exchanged.  And before you
27  know it, we made the -- like a U-turn and jumped over

25

1    the little thing in the street and pulled up into the
2    -- this parking lot, the car.  And we got to the car.
3    They waited and waited thinking that we -- the door --
4    the car wasn't going to get there.  The doors wasn't
5    going to open.  They did and so that's when they
6    scattered.  The one guy decided to try to run to the
7    store.  The other one ran the other way.  The guys in
8    the front seat got out.  I was in the back seat and I
9    followed them.  I followed suit with them in the
10   chase.
11           **PRESIDING COMMISSIONER ENG:**  Did you have a
12   baseball bat in the back seat with you?
13           **PRESIDING COMMISSIONER ENG:**  There was bats
14   in the car.
15           **PRESIDING COMMISSIONER ENG:**  So -- but you
16   made the conscious decision to grab the bat --
17           **INMATE LOSNO:**  Yes, ma'am.
18           **PRESIDING COMMISSIONER ENG:**  -- and jump out
19   of the back seat.
20           **INMATE LOSNO:**  I reached out.
21           **PRESIDING COMMISSIONER ENG:**  And Maria
22   stayed there and she was asking you not to?
23           **INMATE LOSNO:**  Maria was yelling at me at
24   first.  She was -- I mean she didn't think this was
25   going to even happen.  When she saw me coming out,
26   taking out the base -- "Where are you going?"
27   Screaming at me, "Where are you going?"  And I

26

1   followed suit.  When we did what we did, when I did
2   what I did, I went over there and I hit him.  He ran.
3   I came after him.  He was tripping or I caused the
4   trip or he fell over one of those parking, white --
5   you know.

6                  PRESIDING COMMISSIONER ENG:  Right.

7                  INMATE LOSNO:  And when I get there, yes, I
8   hit him in the ankles and (indiscernible).  I remember
9   that and I remember him saying, "Yeah, all right.  All
10  right.  Yeah, all right."  And I could hear Maria
11  yelling in the car.  So when I hear her yelling in the
12  car, I stopped and I looked at her and I go back to
13  her.

14                 PRESIDING COMMISSIONER ENG:  Did you take --
15  did you even notice how young he was when you hit him?

16                 INMATE LOSNO:  I didn't.  No, I didn't
17  because he was -- like me, he had goatees.  No one
18  ever stopped to -- he didn't look like a 15-year-old
19  kid, just like I didn't look like an 18-year-old kid.
20  And it happened so fast.  When I ran back to the car,
21  as Maria had said, "I know him.  I know his family."
22  That's when I remember, I get out of the car and I'm
23  yelling to these guys, "Stop.  Let's get out of here.
24  Let's go."  And therefore the only reason why, because
25  I stood out the car.

26                 PRESIDING COMMISSIONER ENG:  Can you think
27  of any reason why you would follow so seemingly

1   blindly these other guys that you didn't know that
2   well and beating up on a young kid like that? Can you
3   think of anything that triggered in your head that --
4   were you like all of a sudden very angry or something
5   towards this boy?

6          **INMATE LOSNO:** No, it was that although this
7   wasn't in my heart to do or the intentions wasn't to
8   do this. You know, after -- you know, when I stop and
9   I look at all of this, what it was to be honest is
10  that at that time, even though I had pulled away, I
11  hadn't yet pulled all away -- all the way away. I
12  needed -- it wasn't so much for adventure because
13  that's not what I was looking for. But when the
14  adrenaline takes over, I fell in to this -- I don't
15  want to blame it on peer pressure. In many ways it
16  was. There's no excuse for that. It wasn't
17  manipulated by people like go, go, go do it or -- it
18  was just something that, with the adrenaline moving so
19  fast, I decided to follow. And to do my part insofar
20  as to say that I'm not a -- I'm not a punk and I'm not
21  the one who's going to have to pay for this later,
22  afraid of any type of repercussions, as far as the guy
23  who stood in the car. That guy that stood in the car
24  next to Maria, he never came to prison but I know his
25  life became crazy. It was -- generally
26  (indiscernible) what I hear and what happened later on
27  was that he got to move away. Those are the things

28

1    that happen sometimes out of fear if you don't
2    participate in such a way. Repercussions come later.
3    So it wasn't meant to go out there and do something so
4    severe like that. It's to follow suit. And you know,
5    I realize now it was more than adrenaline. It was
6    still not wanting to let go all the way around, you
7    know. Even though we had consumed beers earlier that
8    day, I wasn't totally staggering drunk. It wasn't
9    like that but I know it somewhat had to do with it
10   because that's not my nature. That's not me. And to
11   this day, I constantly always more than double guess,
12   triple guess and I look at all this that brought me
13   here. And I replay it over and over and over because
14   when I spoke to his mom, that was one of those
15   confrontations where although she hit me and she beat
16   me, she had all the right to do so. I just stood
17   there and just let her wail at me, you know. And she
18   asked me what did I think about what I did and I told
19   her in Spanish. She was speaking in Spanish. At that
20   time my mom was standing next to me, too. Maria was
21   standing next -- on my right. My daughter was in a
22   little --
23              PRESIDING COMMISSIONER ENG: Stroller?
24              INMATE LOSNO: -- stroller. She reaches
25   over and she touches my daughter. And after, she
26   said, "Too bad his father -- your father won't be here
27   for a while." And she told me in Spanish, she said in

29

1    Spanish, "You destroyed my life."   I told her I know

2    that she cannot find -- by me saying I'm sorry -- I

3    kept on speaking to her in Spanish.   She just looked

4    at me and I just let her put her head on my chest

5    after she just ran out of energy.   I just held her and

6    my mom spoke to her.   The court proceedings started to

7    pick up and I remember her sitting out in the

8    audience, out there in the crowd.   My family and

9    everyone else and what can I do but look at her?

10          PRESIDING COMMISSIONER ENG:   So basically,

11   you wanted to be accepted by the fellow gang members.

12   You felt that it was easier to go along with them

13   versus refrain like the other guy did?

14          INMATE LOSNO:   No so much wanting to be

15   accepted because they kind of looked up to me as being

16   the big homey because I was bigger than they were.

17   But --

18          PRESIDING COMMISSIONER ENG:   Were all of you

19   about the same age?

20          INMATE LOSNO:   No.

21          PRESIDING COMMISSIONER ENG:   There were a

22   lot younger?

23          INMATE LOSNO:   Yes.   We were all just

24   friends.   Chino, I think was -- I don't know.   I think

25   he was maybe in his middle twenties.

26          PRESIDING COMMISSIONER ENG:  Um-hum.

27          INMATE LOSNO:   Garcia -- I think Spanky --

1   Bustamonte was something like 17, 16. I had just
2   turned 19. The guy in the back seat, I think he was
3   about 18 and Garcia's brother was 14 and Maria was 17.
4   **PRESIDING COMMISSIONER ENG:** Um-hum.
5   **INMATE LOSNO:** (indiscernible) was 15 so we
6   were all trying to live up to something we weren't.
7   **PRESIDING COMMISSIONER ENG:** What happened
8   after you found out that Mr. Ruiz did not survive the
9   beating? How did Maria react to you?
10   **INMATE LOSNO:** Well, Maria, being -- her
11   being my girlfriend and she had told me that she knew
12   the boy's father. That her father knew their family.
13   She supported me because I mean, she's -- not
14   supportive of what I did. Just stand by my side. And
15   I'm looking at her and she would ask me, "You scared?"
16   And I said, "Yeah, you know." I saw it on the news.
17   I went and spoke to my stepfather at the time and he
18   said, "We've got to tell your mother." And I was
19   looking at him. I told him exactly what I just told
20   you.
21   **PRESIDING COMMISSIONER ENG:** Um-hum.
22   **INMATE LOSNO:** And my uncle (indiscernible)
23   came by and he was like, stupid. And I'm like I've
24   got to tell my mother. So I go to my mother and my
25   mother says, "You know what you have to do." I went
26   and turned myself in and they came to my house first.
27   And Maria, before that -- taking me back with them and

31

1   she said, "You scared, babe?"  I said, "Yeah, I'm

2   scared."  We just were young and (indiscernible) I

3   turned myself in twice.

4          **PRESIDING COMMISSIONER ENG:**  Commissioner,

5   do you have any questions to ask Mr. Losno?

6          **DEPUTY COMMISSIONER STAR:**  Yes.  Thank you,

7   Commissioner.  Mr. Losno, how many beers did you drink

8   that day?  Can you recall?

9          **INMATE LOSNO:**  They were like -- they

10  weren't cans.  They were like quarts.  I'd say maybe

11  about three quarts.  And it was regular beer.  It was

12  like Old English malt liquor.

13         **DEPUTY COMMISSIONER STAR:**  Okay.  And did

14  you use any drugs that day?

15         **INMATE LOSNO:**  Yeah, we smoked some weed.

16         **DEPUTY COMMISSIONER STAR:**  Okay.  Mescaline,

17  being weed to you?

18         **INMATE LOSNO:**  That's what I was going to

19  say.

20         **DEPUTY COMMISSIONER STAR:**  Okay.  How much

21  and what time did you start doing that?

22         **INMATE LOSNO:**  Well, when we left Maria's

23  house about maybe 8:30, 9:00.  I can't remember.  It

24  was morning (indiscernible).

25         **DEPUTY COMMISSIONER STAR:**  So your

26  girlfriend's pregnant.  Was she drinking beer and

27  smoking, too?

32

1          **INMATE LOSNO:** No.

2          **DEPUTY COMMISSIONER STAR:** But she's in the

3     car when all this is happening. So you bring your --

4     you decide to get involved with your pregnant

5     girlfriend in the car, not knowing if this gang is

6     going to retaliate and maybe hurt your pregnant

7     girlfriend? Did your mind even think of that?

8          **INMATE LOSNO:** When all this happened, at

9     the end of the day and that area of Daily City, we

10    call it Fogtown because about 3:00 o'clock, it's

11    foggy.

12         **DEPUTY COMMISSIONER STAR:** Um-hum.

13         **INMATE LOSNO:** In the morning when all this

14    -- when I went to her house and we left, it wasn't

15    like that. It was early morning. This was on the way

16    back. All of this we just said, this --

17         **DEPUTY COMMISSIONER STAR:** Um-hum.

18         **INMATE LOSNO:** -- happened -- well, actually

19    (indiscernible) by all that when I turned myself in

20    because this didn't happen right away. What you just

21    said did happen. Not to Maria but some of my

22    companions.

23         **DEPUTY COMMISSIONER STAR:** Well, you said

24    the bat was there. You didn't bring it in the car

25    with you?

26         **INMATE LOSNO:** No. That's what we called a

27    gangbang car. It was full of stuff.

33

1          **DEPUTY COMMISSIONER STAR:** So you got in the
2    car, you looked around. You could see the bat and the
3    golf clubs and you still didn't say pull over. Me and
4    my girlfriend gotta get out here. I mean, that wasn't
5    a red flag to you to see all this gang banging stuff
6    in the car?

7          **INMATE LOSNO:** At that time, I wasn't
8    thinking like that.

9          **DEPUTY COMMISSIONER STAR:** Okay.

10          **INMATE LOSNO:** My mind was -- when we
11    stopped at that red light, that was -- that didn't
12    even cross our mind. That didn't even cross my mind
13    until the hand signals, the FT and -- there's more
14    words that were said, you know.

15          **DEPUTY COMMISSIONER STAR:** Um-hum.

16          **INMATE LOSNO:** I don't want to say it.
17    Futos (phonetic) and just -- it's just a lot of
18    stupidity being yelled back from the store. And the
19    more -- even more ignorance coming out the car so we
20    just met up like that. It wasn't like that's him.
21    That's Jorge. That's -- or the other guy that was
22    with him. It wasn't like that.

23          **DEPUTY COMMISSIONER STAR:** Did they have any
24    weapons?

25          **INMATE LOSNO:** From what I understand, there
26    was a knife in Jorge's pocket and I --

27          **DEPUTY COMMISSIONER STAR:** Did he pull it?

34

1          **INMATE LOSNO:**  No, I never --

2          **DEPUTY COMMISSIONER STAR:**  He didn't have a
3    chance.

4          **INMATE LOSNO:**  No.

5          **DEPUTY COMMISSIONER STAR:**  You know, you
6    state to us that you were trying to pull away from the
7    gang.  But the fact of getting in this gang-banging
8    car with all these weapons inside and then not trying
9    to get out sort of reflects differently.  And you --
10   and from what you're stating, you hadn't been involved
11   that long and it was a short period of time; right?
12   From -- because you dropped out of school; right?  And
13   then what; started hanging out with these guys?

14         **INMATE LOSNO:**  Well, I'd come down to San
15   Francisco and I would see them.  I was living in the
16   East Bay with my dad in San Lorenzo.

17         **DEPUTY COMMISSIONER STAR:**  Uh-huh.

18         **INMATE LOSNO:**  So the reason why I started
19   coming back  more to the city was because of Maria so
20   we'd pick up --

21         **DEPUTY COMMISSIONER STAR:**  Was she in the
22   gang, too, Maria?

23         **INMATE LOSNO:**  She just know everybody.
24   Everyone who belonged to this gang and other streets.
25   What it is, is you've got 24th Street, you have Folsom
26   Street so they consider those gangs.

27         **DEPUTY COMMISSIONER STAR:**  Yeah.

35

1        **INMATE LOSNO:** The Little Park Gang was a
2   little -- was a group of guys who hung around together
3   claiming they were parked outside 24th Street.

4        **DEPUTY COMMISSIONER STAR:** Uh-huh. But you
5   see, Mr. Losno, you're living in San Lorenzo. It's
6   almost like these were deliberate actions, you know,
7   being on the other side of the Bay and being in these
8   areas. It sounds pretty conscious decisions to me.
9   I'm not sure you're seeing how conscious. You say you
10  were pulling away but where you're hanging, when you
11  get in a car and you see all these things. They seem
12  pretty conscious to me. Now, where did you hit this
13  victim with this bat?

14       **INMATE LOSNO:** In the ankles, the legs and
15  shoulders.

16       **DEPUTY COMMISSIONER STAR:** How many hits?
17  Can you recall?

18       **INMATE LOSNO:** Maybe about three or four.
19       **DEPUTY COMMISSIONER STAR:** All right. I
20  think that's all the questions I have at this time.
21  Thank you.

22       **PRESIDING COMMISSIONER ENG:** Let's talk
23  about your previous record. According to what I see
24  here, that there is a -- no record of juvenile arrests
25  that were noted in your central file. Is that
26  correct?

27       **INMATE LOSNO:** Yes.

36

1       **PRESIDING COMMISSIONER ENG:**   Okay.   So you
2   really had a -- the only adult conviction and arrest
3   that you had is for this incident offense; correct?
4       **INMATE LOSNO:**   Yes, ma'am.

5       **PRESIDING COMMISSIONER ENG:**   So your trouble
6   really started when you started hanging around with
7   the gang friends of yours.   Have I missed anything?
8   Were there any other arrests or anything that maybe
9   wasn't reflected in here?

10      **INMATE LOSNO:**   Before that, the only thing I
11  ever had was a run in with the -- with the
12  (indiscernible) PD.   That was going shopping.   We were
13  going shopping for like, for me, for her and there was
14  a gathering of some youngsters in the alleyways.   And
15  I ended up with the same guys who were part of the
16  gang and some guys who hang around the gang.   There
17  was a fight and some chasing.   Some type of brouhaha,
18  jumping off in the alleyway.   And I'm there and the
19  police were over and it was --

20      **DEPUTY COMMISSIONER STAR:**   Hold on, please.
21      **PRESIDING COMMISSIONER ENG:**   That thing has
22  a habit of beeping for quite a few minutes before we
23  get to the end of the tape.

24      **DEPUTY COMMISSIONER STAR:**   Yeah.   Shall we
25  change it now, Ms. Eng?

26      **PRESIDING COMMISSIONER ENG:**   That particular
27  one.   It'll -- it's up to you because it can be

37

1   annoying, that beeping.

2           **DEPUTY COMMISSIONER STAR:**  Okay.

3           **PRESIDING COMMISSIONER ENG:**  Okay.

4           **DEPUTY COMMISSIONER STAR:**  Let me see how

5   much we've got.  Let's change it, okay?  Everybody

6   just relax, all right?

7           **PRESIDING COMMISSIONER ENG:**  Okay.

8   (TAPE 1 SIDE 2]

9           **DEPUTY COMMISSIONER STAR:**  Okay.  This is

10  side two of tape one in the Rafael Losno hearing,

11  C Number 73252.  We're back on record.

12          **PRESIDING COMMISSIONER ENG:**  Let's talk

13  about your personal background.  You were born March

14  4, 1962?

15          **INMATE LOSNO:**  Yes, ma'am.

16          **PRESIDING COMMISSIONER ENG:**  Okay.  And your

17  parents names were Maria Del Castillo and Rafael

18  Losno, Sr.  And you were born in San Francisco?

19          **INMATE LOSNO:**  Yes, ma'am.

20          **PRESIDING COMMISSIONER ENG:**  Native San

21  Franciscoan, okay.  Your father worked for Bolden

22  Grain in San Leandro.  He's now retired.  And your

23  mother owns her own cleaning service and she lives in

24  San Bruno.

25          **INMATE LOSNO:**  San Mateo.

26          **PRESIDING COMMISSIONER ENG:**  San Mateo now?

27  Okay.  I'm taking all of this from the Board Report

38

1 that's dated March 2006.  It states that -- oh, your
2 parents divorced when you were about nine so that's
3 why you were saying that you were -- did you go and
4 live with your father right away after your parents
5 divorced?

6         **INMATE LOSNO:**  No.  I lived with my mom all
7 my life on 17th and Michigan.  Like in the lower San
8 Francisco.

9         **PRESIDING COMMISSIONER ENG:**  Um-hum.

10        **INMATE LOSNO:**  My dad finally did come back
11 into the picture.  I have -- at that time, I had five
12 brothers and sisters, five of us total at that time.

13        **PRESIDING COMMISSIONER ENG:**  Okay.

14        **INMATE LOSNO:**  So he took us to go meet my
15 other brother, Marvin, and I lived with them in
16 Oakland.  We get to San Lorenzo and my dad later on
17 buys a house.  Now I'm already in high school, my high
18 school years.

19        **PRESIDING COMMISSIONER ENG:**  Um-hum.

20        **INMATE LOSNO:**  But I went to school out
21 there in East Bay for a while but I just couldn't stay
22 away from my mom, my grandmother and my grandfather,
23 the rest of my brothers and sisters.  Living in
24 Oakland was okay.  I kind of adapted to it.  I did
25 (indiscernible).  Then I went to San Lorenzo, which
26 was a whole different culture class.  It wasn't the
27 same as being in Oakland or San Francisco or -- it was

39

1  a suburb community and we started experiencing

2  different racial type of treatment in San Lorenzo.

3  The homeowners and all of that. I was a city guy so I

4  would go back (indiscernible) back to my mom's house,

5  my grandfather's house. That's why I always went back

6  and forth until I got used to being out there. My dad

7  went out and bought a house (indiscernible) in San

8  Lorenzo at the time. It wasn't a nice place. It's a

9  beautiful place but as a kid, you know, keeping it

10  really real, it was boring out in that area at the

11  time so I would go back to the city. The city is the

12  city. And my mom, when she moved out of San Francisco

13  and went up -- a little higher up to the hill to Daily

14  City --

15          **PRESIDING COMMISSIONER ENG:** Um-hum.

16          **INMATE LOSNO:** -- so now I'm like,

17  (indiscernible) Daily City. In the East Bay, the only

18  family I had at that time was my dad and his wife.

19  And I didn't really -- they're divorced now. My dad

20  got remarried. But my immediate family, my whole

21  family; my kids, grandkids, they all live -- they

22  still live out there on this side of the Bay. So

23  that's why I'd come back to the San Francisco area

24  every Friday and then finally just decided to stay.

25          **PRESIDING COMMISSIONER ENG:** So you're one

26  of five children?

27          **INMATE LOSNO:** I'm one of seven.

40

1      **PRESIDING COMMISSIONER ENG:** One of seven?
2  Are you like the oldest or --

3          **INMATE LOSNO:** I'm the oldest now.
4          **PRESIDING COMMISSIONER ENG:** Now?  What
5  happened to the oldest one?

6          **INMATE LOSNO:** He passed away.
7          **PRESIDING COMMISSIONER ENG:** How long ago?
8          **INMATE LOSNO:** In '97.  As a matter of fact,
9  when my -- another sister of mine just -- she just
10 flew in (indiscernible).  That's my dad when he was --
11 my dad is native Korean.

12         **PRESIDING COMMISSIONER ENG:** Oh.

13         **INMATE LOSNO:** So his early years out there
14 before he came to the States and met my mom, he had
15 his high school sweetheart out there that left him and
16 now she's here now.

17         **PRESIDING COMMISSIONER ENG:** Okay.

18         **INMATE LOSNO:** I never met her and she's
19 supposed to come this weekend or this week
20 (indiscernible).

21         **PRESIDING COMMISSIONER ENG:** Did any of your
22 other siblings, any of your six other siblings have
23 any problems with the law?

24         **INMATE LOSNO:** (no audible response)

25         **PRESIDING COMMISSIONER ENG:** You're the only
26 one?

27         **INMATE LOSNO:** I'm the only one.  As a

41

1   matter of fact, they (indiscernible).

2           **PRESIDING COMMISSIONER ENG:** Let me ask you
3   something. Did your mother have any idea that you
4   were affiliated with a gang?

5           **INMATE LOSNO:** My mother knew that I hung
6   out in the Mission District. She knew as time was
7   going, I would come home later and later at night.
8   And I remember her (indiscernible). First it was
9   yelling. We'd argue. I was (indiscernible). And I
10  listened to her because I know she was not only my mom
11  but my dad all by herself all them years. And I
12  started staying in Daily City for a while instead of
13  going down to the Mission on the weekends. But in the
14  summertime, it was like hard to stay away from all the
15  girls and the low riders and all that other type of
16  stuff at that time.

17          **PRESIDING COMMISSIONER ENG:** Did you father
18  know also at that time what was going on?

19          **INMATE LOSNO:** My father, he knew that I was
20  hanging in San Francisco, hanging around with the guys
21  down there but he didn't know to what extent.

22          **PRESIDING COMMISSIONER ENG:** Um-hum.

23          **INMATE LOSNO:** And to this day, he blames my
24  mom, saying that he wanted to go live with you. Look
25  what happened. It's all within -- they get along.
26  They're great friends when they come to see me but
27  they still -- my dad harbors a little resentment to

42

1   that.  But it's not my mom or my dad's fault.  It's my
2   fault.
3            **PRESIDING COMMISSIONER ENG:**  I think if you
4   think about it, you could understand that; couldn't
5   you?
6            **INMATE LOSNO:**  Oh, I could indeed.
7            **PRESIDING COMMISSIONER ENG:**  Being that
8   you're a parent now.
9            **INMATE LOSNO:**  Yeah, a grandfather.
10           **PRESIDING COMMISSIONER ENG:**  You're a
11   grandfather?  Goodness.  Okay.  Because I see that you
12   had two children with Maria.
13           **INMATE LOSNO:**  Yes.
14           **PRESIDING COMMISSIONER ENG:**  Okay.  So --
15   and they're two girls?
16           **INMATE LOSNO:**  Yes.
17           **PRESIDING COMMISSIONER ENG:**  So Angelica was
18   the one that Maria was pregnant with --
19           **INMATE LOSNO:**  Right.
20           **PRESIDING COMMISSIONER ENG:**  -- when you
21   committed this crime.  Okay.  So but you were married.
22   So you ended up marrying Maria?
23           **INMATE LOSNO:**  Yes, ma'am.
24           **PRESIDING COMMISSIONER ENG:**  When did you
25   get married?
26           **INMATE LOSNO:**  '82.
27           **PRESIDING COMMISSIONER ENG:**  Okay, yeah.

43

1 Because the Board Report -- two Board Reports in a row

2 state that it was '93.

3 **INMATE LOSNO:** No.

4 **PRESIDING COMMISSIONER ENG:** So that's why I

5 was wondering. So -- because I saw in the '03 Board

6 Report it states that, like, somebody had written in

7 1982 and then you divorced in '84? Is that true?

8 **INMATE LOSNO:** Well, I was -- we were

9 divorced in '84. We got married in '82.

10 **PRESIDING COMMISSIONER ENG:** Oh, I'm sorry.

11 In '82, you were -- yeah, '82 married. Divorced '84,

12 okay. But are you in touch with her?

13 **INMATE LOSNO:** Maria?

14 **PRESIDING COMMISSIONER ENG:** Yeah.

15 **INMATE LOSNO:** We've spoken. You know, I've

16 written her and a lot of it was a lot of hurt for her

17 because she went through some medical issues now.

18 **PRESIDING COMMISSIONER ENG:** Um-hum.

19 **INMATE LOSNO:** And for many, many years we

20 didn't speak and that was because I was upset. I

21 wouldn't see my daughters and I know my daughters were

22 asking for me. I was always thinking about they're

23 getting bigger. And they did come and see me when

24 they were just little babies and my first born, she

25 was my everything.

26 **PRESIDING COMMISSIONER ENG:** Um-hum.

27 **INMATE LOSNO:** And -- but I would stop and

44

1   put myself in her shoes, to hold a grudge against me

2   for leaving, you know, what I mean, with two little

3   babies, her being 17 years old, also.  And we spoke

4   and she had a lot of anger towards me.

5           PRESIDING COMMISSIONER ENG:  Well, you

6   stayed together for just a couple years and I see that

7   you did get married after -- now, when was it.  What

8   time did you start?

9           INMATE LOSNO:  I met her --

10          PRESIDING COMMISSIONER ENG:  You started

11  your term at the -- okay.  You came in here in

12  September of '83 so you were -- you did get married

13  before you came into CDC.

14          INMATE LOSNO:  Oh, yes ma'am.  All -- the

15  case happened in '81.

16          PRESIDING COMMISSIONER ENG:  Right.

17          INMATE LOSNO:  And --

18          PRESIDING COMMISSIONER ENG:  So then you had

19  to go through -- you went through a trial?

20          INMATE LOSNO:  No.

21          PRESIDING COMMISSIONER ENG:  Or you pled it

22  out?

23          INMATE LOSNO:  Yes.

24          PRESIDING COMMISSIONER ENG:  Okay.  So Maria

25  stayed with you but then -- so she was -- she would

26  bring the babies to the institution to see you or no,

27  she never did?

45

1          **INMATE LOSNO:**  My family did.

2          **PRESIDING COMMISSIONER ENG:**  Okay.

3          **INMATE LOSNO:**  My family did and we were

4    already distancing (indiscernible).

5          **PRESIDING COMMISSIONER ENG:**  Um-hum.

6          **INMATE LOSNO:**  And it eventually went that

7    way.  I can see the --

8          **PRESIDING COMMISSIONER ENG:**  When did you

9    talk to your daughters?

10          **INMATE LOSNO:**  I saw my daughter yesterday.

11          **PRESIDING COMMISSIONER ENG:**  No, I want to

12   know when you talked to your daughters about your life

13   crime.

14          **INMATE LOSNO:**  Oh.

15          **PRESIDING COMMISSIONER ENG:**  When were --

16   how old were they when you first broached the subject

17   with them?

18          **INMATE LOSNO:**  I didn't see my daughter

19   until (indiscernible) was 17 years old.  And I would

20   write her and send her gifts and they would receive it

21   but they were just little babies then.

22          **PRESIDING COMMISSIONER ENG:**  Okay.

23          **INMATE LOSNO:**  Maria's mother was the one

24   that she would act as a middleman so I could speak to

25   my daughters.

26          **PRESIDING COMMISSIONER ENG:**  Um-hum.

27          **INMATE LOSNO:**  And my mom -- my mom kept

1   close contact with them.  Maria just decided not to
2   see me and she wasn't going to have any contact.  That
3   was her own personal issue she was having later on.
4   She's a mother now and all her life.  But my daughters
5   got to express their anger towards me when I was at --
6   we really sat down and spoke about it real good in
7   Soledad before coming here.  And over the phone, I
8   remember my daughter couldn't even breathe because she
9   was afraid to hear my voice over the phone until we
10  spoke and I told her what happened that day.  I told
11  her, you know, I was stupid.  I told her about her mom
12  because she would say my mom for a long, long time and
13  she would talk real bad about me.  And I would tell my
14  daughter, why, you know?  She would tell me, "What do
15  you think?"  And I explained to her (indiscernible)
16  and having life be miserable, having to fend for both
17  my daughters, her being a baby herself at 17.  And my
18  daughters, they just wanted to -- their impression
19  was, "Did you ever love my mom?"  I said, "Yes."  To
20  this day, I tell them, I say, "I love your mother.  I
21  love your mom."  My family is always there to help her
22  out should there be something that they want help, or
23  my dad.  That's what really happened in San Lorenzo.
24  My dad bought this nice house and eventually it was
25  for me.  And I just wanted to take care of my
26  granddaughters and I want to provide for them and send
27  them to school and bought pianos and all this other

47

1  stuff.

2  **PRESIDING COMMISSIONER ENG:** Do you think
3  they're afraid of you?

4  **INMATE LOSNO:** My daughters?

5  **PRESIDING COMMISSIONER ENG:** Yeah.

6  **INMATE LOSNO:** Now?

7  **PRESIDING COMMISSIONER ENG:** Yeah.

8  **INMATE LOSNO:** Oh, no. My daughters, they
9  come here. They -- my daughter (indiscernible), she
10  voices her -- I'm the one that just stays quiet and
11  listens to what she says. She's a mother now too, to
12  a little grandson, who's four. And my other daughter,
13  too. They're rough around the edges. Not because
14  they're bad girls but because I haven't been there.
15  And I mean they have their houses and have gone on
16  with their life. But she was here yesterday and she
17  sent (indiscernible) with my grandkids. But my
18  younger daughter does hold a little bit of a grudge
19  the same way. In their lingo, their player, hey, they
20  don't let you out; they hate you. Haley
21  (indiscernible), she understands. I just tell her
22  it's something that -- I committed a crime and I've
23  been sentenced to this time. And my daughter just --
24  she doesn't understand but it hurts her. That's what
25  we go through every other two weeks, every ten days
26  when she brings my grandkids up here. I try to guide
27  her as much as I can. She asks for my opinions and I

1   tell her, I can't tell you what to do.  I'm your
2   father and -- but I haven't been there so I can't
3   order you, I can't tell you.  I can just give you my
4   advice.

5           **PRESIDING COMMISSIONER ENG:**  Do you ever
6   talk to the them about the 15 year old young man whose
7   life was taken?

8           **INMATE LOSNO:**  Yes, I do.  Because she asked
9   me, is it true (indiscernible)?  And exactly what I
10  said earlier.  I say, yeah, that day when that
11  happened, you know.  The sad part is my ex-wife's --
12  Maria's brother has been through the system and he
13  went through the reception center right here when I
14  worked in the hospital.  I saw him and I got to speak
15  to him.  I didn't even know it was him.  They have --
16  Maria has another sister named Anna and Joe, little
17  Joe.  Working as a (indiscernible) here I saw him and
18  I heard the last name, Santiago and I just happened to
19  see him.  It can't be.  So I yelled, "Little."  And he
20  turned around.  He's a man now.  It's been 25 years.
21  He runs up to me and he started crying.  He goes,
22  "Bro, you've always been my brother."  And I asked
23  about him and they sent me pictures but I didn't want
24  to look at Maria because I know where I'm going to go.
25  "How's your mom?  How's your" -- your grandfather was
26  Phillipino.  He died and their family was always sweet
27  to me.  And then finally I took a glance at Maria and,

1    "Look at my sister." I looked at her and she told me
2    -- he told me how it really effected her and she
3    walked to the crime scene and taken to the 7-11. The
4    detective would take her over there and she would tell
5    him -- she would tell him what happened that day and
6    she was shocked. So I finally got a chance to speak
7    to him and, you know, she's just asking when you're
8    coming back. My daughters need me.

9            **PRESIDING COMMISSIONER ENG:** What do you see
10   when I saw the name Jorge Ruiz?

11           **INMATE LOSNO:** I see his mom. I cannot
12   imagine the pain that he went through. I can imagine
13   because I remember when I hit him. His voice was
14   saying, "All right. All right." I remember that
15   very, very clearly. I see anguish, I see pain.

16           **PRESIDING COMMISSIONER ENG:** But you hit him
17   again?

18           **INMATE LOSNO:** No, I walked away. He said,
19   "All right." I remember it. I remember his face. I
20   remember. I can -- I see him. I learned a humbling
21   experience when I myself became a victim in prison,
22   you know. And I -- you know, when I turned my life
23   over to the Lord, there was a moment there when I had
24   a hunger. I had to bow down and dig something out of
25   a toilet to eat. I had nothing to eat. And I
26   remembering following -- how I read my Bible and it
27   says how God sees everything (indiscernible). I

50

1    thought I was a seeker (indiscernible) until I saw a
2    reflection in the toilet looking back at me and it was
3    me.  So when I asked the Lord, I asked him
4    (indiscernible).  And I stopped and I thought about
5    all of this; his mom, because I remember like I was
6    explaining to you how she hit me.  I can remember him.
7    And I asked for how can I (indiscernible).  I cannot
8    speak for Jorge -- for Richard because he was actually
9    killed here, murdered here in this prison many years
10   ago.  But yes, I think about it.  I think about it and
11   that's why I dedicate my life to what I do with kids
12   now.  Every Friday, all right, I've done it in other
13   prisons.  I work with programs, starting programs up
14   to this very day.  As a matter of fact, last Friday.
15   I see them, I take heed to everything and I see his
16   face.

17           **PRESIDING COMMISSIONER ENG:**  Commissioner
18   Star, do you want to -- I'm going to pass this over to
19   her and she's going to review your post-conviction
20   factors with you.

21           **DEPUTY COMMISSIONER STAR:**  Okay.  Mr. Losno,
22   I'm going to be focusing on your behavior and your
23   programming since your last hearing.  And the record
24   reflects your subsequent number six hearing was in
25   December 2, 2004.  Now, you were scheduled for your
26   subsequent number seven hearing in March but that was
27   postponed because of the psyche eval hadn't been done.

1   And you were rescheduled again in June of '06 but that
2   was postponed because the attorney wasn't available.
3   So I'll be focusing on activities since December of
4   '04. You're currently -- your classification score is
5   19, which is of course the mandatory minimum score for
6   lifers and your custody level is medium-A.
7   Disciplinary record shows no 115's since the last
8   hearing. In fact, you have been disciplinary free
9   since 1988. You've had a total of seven 115's but
10  they were primarily in the beginning of your life
11  term, from 1984 to 1988. I took note that they're all
12  Division F offenses and mostly had to do with -- yeah,
13  mostly late for work, delaying count, work stoppage.
14  I saw one threatening staff in '85. You've had though
15  a lot of 128-A's. In fact, the record -- your
16  counseling -- I'm referring to your Counselor's Report
17  prepared for today's heating -- hearing. That was
18  Correctional Counselor I B. Ebert, E-B-E-R-T. And I
19  counted 32 128's between 1983 and 2001. Would that be
20  correct? I don't know if these are duplicate but you
21  got a copy of this report. Did you see all that?
22          INMATE LOSNO: Yes. From 2001?
23          DEPUTY COMMISSIONER STAR: Um-hum.
24          INMATE LOSNO: That 128 was at Soledad.
25          DEPUTY COMMISSIONER STAR: Um-hum.
26          INMATE LOSNO: And that 128 had to do with
27  they were having some ongoing disturbances on the

52

1    mainline, on that yard.

2            **DEPUTY COMMISSIONER STAR:** Um-hum.

3            **INMATE LOSNO:** The staff wanted to interview
4    the mainline.

5            **DEPUTY COMMISSIONER STAR:** Um-hum.

6            **INMATE LOSNO:** When the -- when they started
7    to interview the inmates in the building, I remember
8    opening my door. I'm ready to step out and I notice
9    that no one's stepping out. So I looked to my left,
10   to my right and I look across from me. Soledad is
11   built different from here. I see these guys telling
12   me don't go. I'm like, let's go down the stairs and
13   come back up. So the thing was, do I walk down the
14   stairs and face it the next day or do what everyone
15   else is doing?

16           **DEPUTY COMMISSIONER STAR:** So you went back
17   in?

18           **INMATE LOSNO:** I went back in. So a couple
19   days later, they came back again and I go and I
20   interview.

21           **DEPUTY COMMISSIONER STAR:** Um-hum.

22           **INMATE LOSNO:** They gave me this 128. It
23   was a mistake by them.

24           **DEPUTY COMMISSIONER STAR:** Okay. Your
25   counselor says that there's a 128-B in your file,
26   dated September 30, authored by Lieutenant Crittendon
27   in here. I guess stating that Correctional Counselor

53

1  III Ms. Selvage, S-E-L-V-A-G-E, stated she recalled

2  the incident and knew that Inmate Losno did

3  participate in an interview.

4          **INMATE LOSNO:** I did go interview.

5          **DEPUTY COMMISSIONER STAR:** Okay.

6          **INMATE LOSNO:** And that --

7          **DEPUTY COMMISSIONER STAR:** So without that

8  one, what you're really saying then is you've been --

9  you haven't had any 128's since -- when's the last

10 one? That would make it '92?

11         **INMATE LOSNO:** Yes.

12         **DEPUTY COMMISSIONER STAR:** Okay. I have a

13 question though, you know, and that has to do -- you

14 know, this is a lot when you were initially received.

15 What do you attribute that to?

16         **INMATE LOSNO:** Well, when I first came into

17 the system, a lot of it was for school, for not going

18 to school or getting there late, as well.

19         **DEPUTY COMMISSIONER STAR:** Um-hum.

20         **INMATE LOSNO:** I'm getting A's, I'm getting

21 B's. I had no excuse. I was 21, 22. A lot of the

22 guys were the same age and sometimes I wouldn't go. A

23 lot of them was for school, so I would get there late.

24 Sometimes I wouldn't go. And at that time, my way of

25 thinking was well, I'm getting A's and B's. I can

26 play hooky. And I'm running around the yard and

27 lifting weights and doing all of that, until they

54

1  would give me the 128's. And my thing was always
2  well, you have to give me a verbal and all that. I
3  didn't really look at them as really important factors
4  back then.

5      **DEPUTY COMMISSIONER STAR:** Okay.

6      **INMATE LOSNO:** Until my teacher asked me
7  (indiscernible) like that and that was it.

8      **DEPUTY COMMISSIONER STAR:** So something
9  happened in 1990 that you think turned you around,
10 this I'd better take this more serious? Or you think
11 you just matured or what do you think?

12     **INMATE LOSNO:** Well, I was growing up. And
13 when I -- first, being in prison is no fun.

14     **DEPUTY COMMISSIONER STAR:** Um-hum.

15     **INMATE LOSNO:** And there was times when the
16 guys we hung around were the same age and I started
17 having fun. Like playing ball and just not taking
18 care of my responsibilities, until I started seeing
19 how serious and how dangerous prison really is. Until
20 I started noticing stabbings and murders and I said
21 wait a minute. And there it was. You got to grow up
22 right away. And just seeing my family coming up every
23 weekend and hearing constantly from my family about
24 that time. I'm like no, I knew it was time to cowboy
25 up.

26     **DEPUTY COMMISSIONER STAR:** Okay. All right.
27 Let's move onto your vocational. Did -- you completed

55

1    a vocational dry cleaning --

2              INMATE LOSNO:  Yes, ma'am.

3              DEPUTY COMMISSIONER STAR: -- courses in

4    2004.  Does that sound correct?

5              INMATE LOSNO:  Yes, ma'am.

6              DEPUTY COMMISSIONER STAR:  Were you here,

7    sir, or where were you?

8              INMATE LOSNO:  Yes, here at San Quentin.

9              DEPUTY COMMISSIONER STAR:  You were here?

10   Okay.  And you're currently participating in the

11   vocational plumbing.  How far along are you?

12             INMATE LOSNO:  Yes, ma'am.  I need two more

13   books and I'm done with that trade.

14             DEPUTY COMMISSIONER STAR:  Okay.

15             INMATE LOSNO:  I'm doing it -- since the

16   last time I appeared and it was postponed.

17             DEPUTY COMMISSIONER STAR:  Uh-huh.

18             INMATE LOSNO:  I just -- you know, I'm going

19   to take another one and see what I can learn.  I'm

20   learning because my brothers, they're all grown up

21   now.

22             DEPUTY COMMISSIONER STAR:  Uh-huh.

23             INMATE LOSNO:  They live by the church.  And

24   when they come to see me, he says hey, being a deacon

25   is a lot of responsibility.  So he's wiring, plumbing.

26   My dad's got a pool and I said, you know what?  I'm

27   going to see whether I can pick up some of the

56

1    plumbing trade here --

2              **DEPUTY COMMISSIONER STAR:**  Okay.

3              **INMATE LOSNO:** -- so I can know what to do

4    when they say hey, let's go do this.  Then I at least

5    know something.  I'm not ignorant to what I've got to

6    help them with.

7              **DEPUTY COMMISSIONER STAR:**  So are you doing

8    this full time or --

9              **INMATE LOSNO:**  Yeah, full-time.

10             **DEPUTY COMMISSIONER STAR:**  Okay.  And I do

11   take note that the Board did receive your November 28,

12   2006 Certificate for having completed the Level I

13   book, as well as a June Certificate for completing the

14   core curriculum plumbing book.  And --

15             **INMATE LOSNO:**  It goes hand and hand in some

16   of the construction jobs (indiscernible).  The reason

17   why they (indiscernible) be ignorant to.

18             **DEPUTY COMMISSIONER STAR:**  Okay.

19             **INMATE LOSNO:**  I just know you've got to

20   know something.

21             **DEPUTY COMMISSIONER STAR:**  Okay.  I didn't

22   see any recent, though, evaluations.  Work

23   evaluations.  Did the teachers write any evaluations

24   on you, other than --

25             **INMATE LOSNO:**  Yeah.  I turned in --

26             **DEPUTY COMMISSIONER STAR:**  Is that this

27   chrono?

57

1           **INMATE LOSNO:**  The letter, yeah.

2           **DEPUTY COMMISSIONER STAR:**  Okay.  All right.

3           **INMATE LOSNO:**  And I have a letter from my

4    instructor.

5           **DEPUTY COMMISSIONER STAR:**  Okay.  Okay,

6    we'll get into that then.  All right.  And

7    educationally -- of course when you came to prison you

8    were a 12th grade dropout.  You got your GED, though,

9    in 2000; correct?

10          **INMATE LOSNO:**  Yes, ma'am.

11          **DEPUTY COMMISSIONER STAR:**  Okay.  And I see

12   that you've been attending college programs.  In fact,

13   the counselor lists a number of your courses that

14   you've been taking.  Is that through the -- is that

15   called the Patton College Program?

16          **INMATE LOSNO:**  Yes, ma'am.

17          **DEPUTY COMMISSIONER STAR:**  Okay.  And this

18   year, I counted -- since your last hearing I've

19   counted at least six courses that you've taken so

20   that's great.

21          **INMATE LOSNO:**  I just finished one last

22   week.

23          **DEPUTY COMMISSIONER STAR:**  What was that in?

24          **INMATE LOSNO:**  A few more classes I get my

25   AA.  I should be done in about --

26          **DEPUTY COMMISSIONER STAR:**  Three more to

27   your AA?  All right.  Very good, sir.  All right.  And

58

1    let's talk about your participation in self-help

2    groups since your last hearing.  And I did receive

3    certificates.  You've got several certificates from

4    the Impact Program, a certificate from the Real

5    Choices Program and a certificate from the Marin's

6    Womens Services Mankind Men's Program, which you

7    participate in for five months.  Is that correct?

8              **INMATE LOSNO:**  Yes, ma'am.

9              **DEPUTY COMMISSIONER STAR:**  Okay.  Lark

10   Program.

11             **INMATE LOSNO:**  Yes, ma'am.

12             **DEPUTY COMMISSIONER STAR:**  Trust.

13             **INMATE LOSNO:**  Yes, ma'am.

14             **DEPUTY COMMISSIONER STAR:**  And an anger

15   management course and Overcomer's Outreach.

16             **INMATE LOSNO:**  Yes, ma'am.

17             **DEPUTY COMMISSIONER STAR:**  Now, I'd like to

18   ask you to tell me, that's got a NA type foundation?

19             **INMATE LOSNO:**  AA and NA.

20             **DEPUTY COMMISSIONER STAR:**  A 12-step kind of

21   foundation to it?

22             **INMATE LOSNO:**  The same thing.

23             **DEPUTY COMMISSIONER STAR:**  Yeah.  How long

24   have you been participating in that?

25             **INMATE LOSNO:**  Since I got here and I've

26   been here going on five years, February.  I also

27   participated in AA in Pelican Bay.  I facilitate the

59

1    group now.

2              **DEPUTY COMMISSIONER STAR:**  Okay.

3              **INMATE LOSNO:**  It goes hand in hand with the

4    Christian (indiscernible).

5              **DEPUTY COMMISSIONER STAR:**  Okay.  Have you

6    been consistently participating?  No breaks?

7              **INMATE LOSNO:**  Every Thursday.

8              **DEPUTY COMMISSIONER STAR:**  Okay.

9              **INMATE LOSNO:**  I go because I like sharing

10   with the outside sponsors.

11             **DEPUTY COMMISSIONER STAR:**  Um-hum.

12             **INMATE LOSNO:**  A lot of them have to be all

13   the program with the (indiscernible).  They do the

14   spiritual thing and that's -- it's great.  They're

15   beautiful people.  So it's not -- when we have our

16   regular meetings, we share.  They fly from Arizona.

17   We have family time, you could say.  It's not family

18   but it's family anyway.  It's a beautiful thing.

19             **DEPUTY COMMISSIONER STAR:**  Okay.  That's

20   every Thursday you do that?

21             **INMATE LOSNO:**  Every Thursday.

22             **DEPUTY COMMISSIONER STAR:**  All right.  Any

23   other -- because I'm just highlighting the major ones

24   you've participated in since your last hearing, sir.

25   Any others that I may have missed here that you'd like

26   to tell me about?

27             **INMATE LOSNO:**  We just started another group

60

1    called The Practice.

2         **DEPUTY COMMISSIONER STAR:**  Um-hum.  What's

3    that about?

4         **INMATE LOSNO:**  That's about performing a day

5    of National Peace here in San Quentin, going hand in

6    hand with the outside community in San Francisco in

7    the Mission District.  That's where I continue to give

8    back.  My daughters live in the area so they tell me

9    about the area.  I know what's happening in the area.

10        **DEPUTY COMMISSIONER STAR:**  Um-hum.

11        **INMATE LOSNO:**  And these kids that come in

12   here every Friday, I know what's happening out there.

13   These kids are not like -- this crime that I

14   committed, this crime I'm here for now.

15        **DEPUTY COMMISSIONER STAR:**  Um-hum.

16        **INMATE LOSNO:**  When I think about back then

17   and how it is now, it's ten times -- no 20 times

18   worse.  So there was a big old movement in the Mission

19   District.  They had a minute of silence to stop the

20   violence so we picked up that philosophy and we

21   brought it here.  So we meet every Thursday before I

22   go to my Overcomer's.

23        **DEPUTY COMMISSIONER STAR:**  Um-hum.

24        **INMATE LOSNO:**  With the approval of the

25   Associate Warden here.  And our idea is to have a --

26   well, we have it on board already with the media so we

27   can let the outside community know how we have to stop

1  the violence in here so these youngsters can emulate
2  what we do in here. So they can stop what they're
3  doing out there.

4          DEPUTY COMMISSIONER STAR: So people come in
5  from the out -- who's coming in from the outside?
6          INMATE LOSNO: Yeah. Radio stations.
7          DEPUTY COMMISSIONER STAR: Okay.
8          INMATE LOSNO: Maybe Channel 7, KGO.
9          DEPUTY COMMISSIONER STAR: Okay.

10         INMATE LOSNO: We're getting big, strong
11  support of the outside community and it's to go hand
12  in hand with what's happening out there. Because in
13  February, what really kicked this idea, in February
14  there was a riot here between the African American
15  community and the Hispanic community and that kind of
16  spilled over into the streets. So we did -- we take
17  that concept and we were trying to do something so
18  they could emulate the opposite of that. So it's
19  called National Day of Peace. It didn't happen
20  (indiscernible). It's scheduled for Apri 28 of this
21  coming year. That's our date right now so we're
22  trying to get that one to the outside.

23         DEPUTY COMMISSIONER STAR: Okay. Any other
24  programming you've done recently you want to share
25  with the Board?

26         INMATE LOSNO: My Choices, My Choices
27  Program. I'm also a steering committee member. The

62

1    Lark, which I'm also a facilitator.

2           **DEPUTY COMMISSIONER STAR:**  Okay.  We
3    mentioned that.

4           **INMATE LOSNO:**  Anything else is just media;
5    radio, TV.

6           **DEPUTY COMMISSIONER STAR:**  All right.  Let's
7    move onto your Psychiatric Evaluation.  The last one
8    was prepared on May 22 of 2006 by Dr. Michele Inaba,
9    spelled I-N-A-B-A.  And focusing first on the -- any
10   psychiatric diagnosis, Dr. Inaba says Axis I is, there
11   is no diagnosis.  And the only thing she indicates is
12   that there was adolescent antisocial behavior by
13   history.  No diagnosis on Axis II.  No issues on Axis
14   III.  GAF score is 78.  The prior Psyche Evaluation
15   was by Dr. Godyne, G-O-D-Y-N-E, back in '04 and that
16   said a moderate risk to safety so another Psyche
17   Evaluation was ordered.  And I'm reviewing the summary
18   of Dr. Inaba's report.  Actually, before I get to the
19   summary, there's a couple of issues that Dr. Inaba
20   addressed that I'd like to ask you about, sir.  And
21   one is that you indicated to Dr. Inaba that you came
22   from some physical fighting between your parents.  A
23   family with some physical fighting between parents and
24   that you yourself acknowledge you may have been
25   jealous and possessive of your, I assume first wife
26   and you admitted striking her.  Is that correct?
27          **INMATE LOSNO:**  Yes, ma'am.

63

1        **DEPUTY COMMISSIONER STAR:** Okay. And the
2   doctor in -- when it gets to the summary indicates a
3   little concern for that because feels you should be
4   participating in some type of counseling regarding
5   relationships. Do you feel you have an issue there?

6        **INMATE LOSNO:** I don't have an issue. When
7   I struck Maria, it was more like a push. It was more
8   of pulling each other's hair. We were teenagers. But
9   as far as counseling, I would love that. I mean, you
10  know, I got married not knowing what the definition
11  was all about, being a youngster. I had kids, not
12  knowing what it is to be a responsible father or
13  husband because I had no experience in any of that.
14  And to be quite frank, I had no experience as far as a
15  long-term social relationship with I could say a wife
16  or a girlfriend.

17       **DEPUTY COMMISSIONER STAR:** Um-hum.

18       **INMATE LOSNO:** It was three.

19       **DEPUTY COMMISSIONER STAR:** Um-hum.

20       **INMATE LOSNO:** But I'd love to learn more,
21  you know. I had -- I was engaged about a year and a
22  half ago and that was beautiful and I was learning
23  through that. It's not so much -- I mean, I'm 44. I
24  have no experience as far as going out there and
25  having many different relationships so I know what to
26  expect and how to deal with certain things.

27       **DEPUTY COMMISSIONER STAR:** Um-hum.

64

1          **INMATE LOSNO:** So with Erma, it was a

2    beautiful experience. My daughters, that's what --

3    that -- I remember that question she asked with regard

4    to Maria and my daughters. And my daughters didn't

5    want that relationship to happen and the reason why is

6    because they wanted the attention.

7          **DEPUTY COMMISSIONER STAR:** Um-hum.

8          **INMATE LOSNO:** And I believe they deserved

9    it. But yes, I would.

10          **DEPUTY COMMISSIONER STAR:** Is that

11   relationship still intact? I missed that.

12          **INMATE LOSNO:** No. It's --

13          **DEPUTY COMMISSIONER STAR:** You're no

14   longer --

15          **INMATE LOSNO:** Her daughter was jealous of

16   her coming up every weekend.

17          **DEPUTY COMMISSIONER STAR:** Oh.

18          **INMATE LOSNO:** And my daughters were

19   jealous. What happened was, my daughter, the oldest

20   one, she came into the visiting room and sees me with

21   Erma Gonzalez is her name. And she knew about her

22   already but just her -- the sight that I'm with some

23   other woman made her get really upset. And I remember

24   even staff told -- because they know me very well

25   here. They said that's your dad. That's his

26   girlfriend. And she didn't want that to happen so

27   just to avoid any further, you know, feeling

1    uncomfortable, we decided to remain good friends.  She

2    lives in San Mateo also and I decided to -- it would

3    be best that way.  So -- but I love the -- to go and

4    learn more about that.  A relationship is more than

5    just physical.  I know that.  I want that.

6              **DEPUTY COMMISSIONER STAR:**  Okay.  Let's --

7    referring now to the doctor's summary of your risk;

8    I'm referring and going to read from page five of the

9    doctor's report, second paragraph on the bottom.

10              "The present examiner also agrees with

11              Dr." --

12   [TAPE 2 SIDE 1]

13              **DEPUTY COMMISSIONER STAR:**  Tape two of two,

14   side A, for Rafael Losno, C Number 73252.  And we're

15   back on record.  Okay, reading the psyche's concluding

16   paragraph or summarizing paragraph, it says that:

17              "The present examiner agrees with

18              Dr. Godyne's conclusion that, given his

19              crime and his institutional record,

20              Mr. Losno would be at low risk for violent

21              recidivism, compared to the members of the

22              inmate parolee population.  Comparing

23              Mr. Losno's risk of future violent behavior

24              to members of society, who have no history

25              of substance abuse, violence or

26              incarceration, however, may be like

27              comparing apples to oranges.  Based on his

66

1              exposure to violence in prison, Mr. Losno
2              would be expected to be both better able to
3              formulate a violent response if needed and
4              also more skilled at avoiding violence than
5              individuals with less exposure.  Mr. Losno's
6              institutional record would suggest that he
7              is highly adept at avoiding violence in
8              almost any institution.  Any situation,
9              rather.  This would suggest that with the
10             maintenance of abstinence and enunciation of
11             gang affiliation, he would be at low risk
12             for violent recidivism in the community."
13   So I notice, Mr. Losno, the -- in the older psyche
14   reports that -- the issue of gang affiliation.  Tell
15   the Board, when did you stop or seeing yourself as
16   affiliated with any gang in prison?
17             **INMATE LOSNO:**  Well, affiliated?  I've never
18   been part of any prison gang.
19             **DEPUTY COMMISSIONER STAR:**  Um-hum.
20             **INMATE LOSNO:**  My affiliation with the
21   prison gang is that's all there was on the mainline.
22   The general population while at Pelican Bay and other
23   prisons.  And the peer pressure of gang participation
24   is great.  As far as committing crimes for them or
25   doing what they want to order people to do, I never
26   did do any of that or been part of any of that.
27             **DEPUTY COMMISSIONER STAR:**  Okay.

67

1           **INMATE LOSNO:**   What I would see and what I
2    saw eventually I became (indiscernible) was
3    (indiscernible).  I'm not going to do any of this.
4    You would see what happened to other guys; stabbed,
5    sliced.  I'd go with the program in order to -- if
6    they'd say go out to the yard at a certain time, I'd
7    go out to the yard at a certain time.  If we've got to
8    stay out to a certain time, I'd stay out until a
9    certain time.  There come a point after doing some
10   long thinking, saying I'm going to stop programming.
11   I'm not going to have anyone tell me what to do, as
12   far as especially them.  I distanced myself away from
13   that a long time ago.  Eventually, I ended up getting
14   stabbed, too and sliced (indiscernible).

15          **DEPUTY COMMISSIONER STAR:**   What year was
16   that?

17          **INMATE LOSNO:**   This was in 1998.  It was
18   '98.

19          **DEPUTY COMMISSIONER STAR:**   I saw a statement
20   that referred to you handling the mail for the gang?

21          **INMATE LOSNO:**   Oh, yeah.  I'd go with the
22   flow.  They'd say hold this.  I'd hold it.  What they
23   call institutional kite.

24          **DEPUTY COMMISSIONER STAR:**   Um-hum.

25          **INMATE LOSNO:**   I'd hold that and then
26   (indiscernible).  As far as a knife here, take this
27   knife there and do that, I --

68

1      **DEPUTY COMMISSIONER STAR:** You didn't have
2   anything to do with that?

3      **INMATE LOSNO:** No. And usually, I'm not
4   going to say I intimidated. I'm pretty good size.
5   It's mostly they would give me so-called respect
6   because I'd been down a long time. And in prison you
7   don't see nothing, you don't hear nothing, don't want
8   to know nothing. My thing was I don't want to know
9   nothing (indiscernible). That's all. I mean, you
10  have to program, your philosophy of programming on the
11  mainline, that's all there is. If it's not
12  destruction in there and all these other -- all these
13  different (indiscernible).

14     **DEPUTY COMMISSIONER STAR:** So up to 1998,
15  did they sort of see you as going with the flow but in
16  '98, they asked you to do something?

17     **INMATE LOSNO:** No. Since all these years --
18     **DEPUTY COMMISSIONER STAR:** Um-hum.

19     **INMATE LOSNO:** -- being incarcerated,
20  they've all looked at me as "a homeboy."

21     **DEPUTY COMMISSIONER STAR:** Um-hum.

22     **INMATE LOSNO:** I was never asked to do
23  certain things. Earlier, you get involved because you
24  want to. I never got involved in any of that. In
25  1998 after I was released from the chute (phonetic) --
26     **DEPUTY COMMISSIONER STAR:** Um-hum.

27     **INMATE LOSNO:** -- I said look, I've been

69

1   clean.  Leave me alone.  There was a big riot up there
2   in Pelican Bay with north and south; Northern
3   California, Southern California.  And now, that's the
4   first time even in these 20 some years they come and
5   asked me, we want you to go ahead and stab this guy.
6   And I'm like no.  I'm getting on the bus.  I'm working
7   with the kids.  We started the Rock Program up there.
8   I got respect from all these gangs from taking -- from
9   asking permission.  And they wasn't just the northern
10  gangs.  A lot of gangs gave me that, their respect as
11  far as they trust me.  And before we got to clear that
12  -- start that program, I had to go and attend
13  (indiscernible).  I'm the co-chairman of that group.
14  I had to go and ask these people.  There were going to
15  be kids.  They respected enough to say all right,
16  bring kids in.  And so I had that type of respect from
17  people.  I said look, I'm going to do this.  Don't --
18  we're in charge of these kids.  Okay, it's all good.
19  In '98, there was a lock down and I remember, I was
20  taking a shower.  They said look, we want you to do
21  this.  I said look -- I'm the only one that has
22  access.  I was down as a other because I'm not
23  Mexican.  (indiscernible).  I'm getting on the bus and
24  we had a whole argument and I said, if anything, if
25  you respect me, you won't ask me to do this.  I'm
26  getting on the bus.  If you so-called love me, then
27  get on the bus.  I want out of here.  Okay, that's

1   cool. We're good. I didn't do it. I said no. I'm
2   already showering and before you know it I just -- I
3   -- you know, my eyes are full of soap. I've got
4   shampoo and I'm like, I felt something and I'm trying
5   to see what it is. Then I feel another one come
6   across my face and another on my head and these are
7   the guys who I was like -- you know. I've been quiet
8   all these years. I've never gone against you guys.
9   What can I do? There's five of them. I'm by myself,
10  you know what I mean. I'm not a violent guy. I
11  looked at it and I was more shocked then anything.
12  And I see -- I couldn't really see and I'm naked and
13  bleeding. I said, that's how you pay me back,
14  homeboys? And ever since then I've always -- I always
15  say I've got the Heisman Trophy pose. I was like,
16  stay away from me, you know. I continue to do my
17  programming to this day. It's peer pressure in here
18  every day. They know where I've been. The only thing
19  they say is oh, yeah, he's been down a long time. I
20  still continue working with kids. I do what I do.
21  I've been chastised and blackballed and all these
22  situations and I've been walking the walk. And it
23  says turn the other cheek. I wear it. So I've never
24  put my hands on anyone in prison. If anything, I felt
25  the blows. I said, no, that's -- I can't do that.
26          **DEPUTY COMMISSIONER STAR:** Okay. Now, I
27  tried to highlight the major programming and behavior

71

1    things since your last hearing but did I miss

2    anything, Mr. Losno, that I -- you want to tell the

3    Board in terms of what's happened?  What you've been

4    doing in the institution since your last hearing?

5         **INMATE LOSNO:**  Oh, I was selected to appear

6    on CNN, on Larry King Live show.

7         **DEPUTY COMMISSIONER STAR:**  Uh-huh.

8         **INMATE LOSNO:**  That came as a shock.

9         **DEPUTY COMMISSIONER STAR:**  What was it for?

10   Tell me what the --

11        **INMATE LOSNO:**  It was convicted felons could

12   be transformed and my redemption.

13        **DEPUTY COMMISSIONER STAR:**  Okay.

14        **INMATE LOSNO:**  It was a two part series.  I

15   was chosen by a lieutenant, Mr. Vernell Crittendon.

16        **DEPUTY COMMISSIONER STAR:**  Uh-huh.

17        **INMATE LOSNO:**  He's a beautiful person.  I

18   asked him, why me, you know?  He said well, you've

19   done your homework and you did a radio interview with

20   a Christian radio station a while back.  He said,

21   people were calling and things went off the charts

22   with what you said.  I walk my walk.  We just want you

23   to share your experience of how you found the Lord and

24   what you've done and what you do.  And I said well,

25   let me ask my family and all that because I was

26   really, really nervous.  I know who Larry King is and

27   I'm like yeah, everyone was afraid.  Yeah, that guy

72

1   will turn your words against you.  I said well, I have
2   nothing to hide.
3          **DEPUTY COMMISSIONER STAR:**  When did it play?
4   When did it play on TV?  What was the date?
5          **INMATE LOSNO:**  June 6.
6          **DEPUTY COMMISSIONER STAR:**  Okay.
7          **INMATE LOSNO:**  Yeah, June 6.  I was -- I
8   remember doing --
9          **DEPUTY COMMISSIONER STAR:**  How many were
10  selected?  You and --
11         **INMATE LOSNO:**  Oh, that was a two-day.  My
12  shot was -- one, two, three, four, including two
13  (indiscernible) and two ex-inmates.  The day before
14  that was another panel like that.  They were all
15  chosen by Mr. Vernell.  A lot of us who do all these
16  programs in prison and what we've done during our
17  incarceration.  And they -- I remember they
18  interviewed me in my cell.  That's the only time I've
19  ever been -- I danced in public when I was a kid in
20  parades and all that.  But I couldn't believe I was
21  actually -- I was on CNN, you know.  And I remember in
22  my cell and I was kind of ashamed that my family would
23  have to see me in the cell.  My daughters were crying.
24  They said, that's my dad.  He lives in a box.  But
25  then again, they saw the reality of what -- how I've
26  been living the last 25 years.  My baby brother said,
27  "Hey, man, you've got a lot of CD's."  I said, "Well,

73

1    I like my music." But the actual taping itself, there

2    was a free moment there I said -- I was about to get

3    up and run because I was kind of nervous at that one

4    until he finally came to meet me, Mr. King.  He told

5    me to relax.

6         **DEPUTY COMMISSIONER STAR:**  He came here and

7    filmed or were you on the television thing?

8         **INMATE LOSNO:**  Yeah, here.  No, it was right

9    here.

10        **DEPUTY COMMISSIONER STAR:**  Okay.

11        **ATTORNEY FOX:**  In the courtyard.

12        **INMATE LOSNO:**  Yeah.  But before that, we

13   met in the chapel and he was very nice.  And since

14   that day, I've received a lot of mail from all over

15   the place.  From the United States and different parts

16   of the world, talking about how they appreciate

17   (indiscernible) the Lord because I did talk about the

18   Lord a lot and what I do with these kids on Fridays.

19   And they asked me about parole.

20        **DEPUTY COMMISSIONER STAR:**  Um-hum.

21        **INMATE LOSNO:**  He quoted me.  He said,

22   "You're the only one there on the panel with 15 years

23   to life.  You were eligible over ten years ago.

24   Surely, you must be disappointed.  Some guys had

25   dates, for example.  I don't know what they tell you

26   before the Board.  You must be disappointed.  Ten

27   years -- he said 15 to life means 25.  And I just

74

1    remember the camera (indiscernible) and I said well, I

2    know it's a process.  And he asked me what do you --

3    what does the panel tell you?  I said, well, continue

4    to do your work and continue progressing and I will be

5    one of those responsible (indiscernible).  And then he

6    asked (indiscernible).  And I said (indiscernible)

7    I'll get out of here.  And he asked me, "What do you

8    do every day?"  I remember them questions.  I said,

9    well -- he goes, "You must think about it."  I think

10   about it every day but what can I do?  Hate the world?

11   I can't do that.  I'm in prison.  I killed somebody.

12   I stand at my door and I think about it.  And how do I

13   release my energy?  I was like first I meditate and I

14   thank God for every day of life.  And I wait for

15   Fridays so I can talk to the kids.  And that's why I

16   try to steer them from coming in here.  That's what I

17   told him.  It's not word for word.  I remember,

18   though.  The mail has kept on coming and I continue to

19   do it every Friday when we have the kids.  I really

20   enjoy the program.  And now we've got a chapter out

21   there on the street and it's starting to blossom out

22   there and I want to be part of that, also

23   (indiscernible).

24            **DEPUTY COMMISSIONER STAR:**  I also have -- I

25   should have read it on the chrono.  I have an October

26   12, 2006 laudatory chrono from Correctional Officer

27   Evans, E-V-A-N-S, who says he's known you for almost

75

1    five years.  That you -- particularly while you were
2    working I guess in medical supply for a couple years.
3    And that you assisted staff in that assignment.  That
4    you're bilingual and you've always been on hand to be
5    an interpreter, too.  And he continues to observe you
6    while he works the education security officer position
7    and has noted your determination to get your college
8    education.  And he also noted that you're working
9    toward your vocational plumbing certificate.  Okay.
10   I'm going to turn -- ask you to turn your attention
11   back to Commissioner Eng.

12            **INMATE LOSNO:**  Yes.

13            **PRESIDING COMMISSIONER ENG:**  Let's go over
14   your parole plans right now, okay?  I see in this
15   large 2006 Board Report that you had used for your
16   future plans residency, you -- I believe your first
17   choice would be to reside with your father back in San
18   Lorenzo.  Is that true or has that changed?

19            **INMATE LOSNO:**  Well, I would love to live
20   with my dad.  In previous years when I've come before
21   the Board, they've always said that I have to parole
22   back to San Mateo County because my crime was
23   committed.  And that, San Mateo County, is -- all my
24   family lives there.  And there's changes that my
25   sister, Gina -- they're all grown up now.  She's
26   offered me a place for me to live there.  My mom, my
27   sisters, my brothers, my kids.  They all live in San

76

1    Mateo County. They've all offered me to live with
2    them. However, with my dad, the reason why is because
3    I wouldn't be so much of a burden on my brothers and
4    my sisters. The reason why I do want to go to San
5    Mateo County is for my mom. I haven't seen her in two
6    months and I know her health is -- she hasn't -- I
7    haven't seen her. And every time I call, she's
8    telling me she's good but she's usually a champion
9    every weekend. She hasn't come and I want to go there
10   to take care of her in San Mateo County, the City of
11   San Mateo and then eventually with my dad in San
12   Lorenzo. It would be a lot easier. It's a bigger
13   house. It's just -- I've got my own room there. I
14   would be away. I don't want to be a burden to the
15   rest of my brothers and sisters because they all have
16   kids, even though they've got places for me. My dad's
17   got -- he's retired. He actually's been on --
18   somebody's bringing him over to (indiscernible). His
19   health -- his -- he goes -- he has the what you call
20   it? The cancer of (indiscernible). He's getting --
21   you know, getting older.

22          **PRESIDING COMMISSIONER ENG:** But you didn't
23   like San Lorenzo.

24          **INMATE LOSNO:** But you know, back then I was
25   19 and stupid, very ignorant. I mean, I was sharp in
26   school because I went to private school.
27   (indiscernible) but now I'm a grandfather. I know

1   what's right and wrong.  I -- you don't have to put

2   your hands to the fire to know you'll get burned.  One

3   time is all it takes.

4         **PRESIDING COMMISSIONER ENG:**  I do -- I went

5   through all these letters and I didn't see any letters

6   from your father or your mother, unless I missed

7   something.  So why don't I go ahead and read into the

8   record what these are in general.  And then if you

9   could, pay attention to what I'm going through and

10  then let me know where I've missed because I didn't

11  see I didn't think any residential ones.  But -- so

12  the first one I have is dated December 14, 2006 from

13  Rosie Stefanatos, S-T-E-F-A-N-A-T-O-S.  And who is

14  this?

15        **INMATE LOSNO:**  She is Larry King's producer.

16        **PRESIDING COMMISSIONER ENG:**  Oh, okay.  All

17  right.  So I'm taking it this is a general support

18  letter?

19        **INMATE LOSNO:**  Yes.  She's a very nice lady.

20        **PRESIDING COMMISSIONER ENG:**  Okay.  Because

21  she states:

22        "I strongly feel that he would not be a

23        threat to society but rather, an asset."

24  Okay.  So that's a nice support letter.  Okay.  It's

25  dated from Venice, California.  Then I have one from,

26  oh, Vernell, V-E-R-N-E-L-L, Crittendon,

27  C-R-I-T-T-E-N-D-O-N, Correctional Lieutenant at San

78

1    Quentin State Prison.  Okay.  This is a support letter
2    for Mr. Losno.  Okay.  Did I say when that was dated?
3    December 15 -- oh, wrong date -- 2007.  He's a little
4    ahead of himself.  We have one dated 12/1/2006.  This
5    is from your daughter and I don't pronounce it the
6    same way you do.  I pronounce it Angelica Losno.

7              INMATE LOSNO:  Okay.

8              PRESIDING COMMISSIONER ENG:  Yeah, this is
9    your oldest daughter.

10             INMATE LOSNO:  That's her.  That's my --

11             PRESIDING COMMISSIONER ENG:  Okay.  I don't
12   see any address on this but I thought I skimmed
13   through this and it's a -- unless I missed something,
14   unless you can point that out to me.  But I think in
15   general, it's a support letter for your release.  But
16   I don't think she states anything about providing
17   residence?

18             INMATE LOSNO:  No.  She said they arrived
19   today.

20             PRESIDING COMMISSIONER ENG:  Pardon me?

21             INMATE LOSNO:  She said -- my attorney said
22   they arrived today.

23             PRESIDING COMMISSIONER ENG:  Okay.  Okay.

24             INMATE LOSNO:  But I've got a date planner
25   here somewhere with all the addresses (indiscernible).

26             PRESIDING COMMISSIONER ENG:  But -- okay.

27   So she lives in San Francisco?

1        **INMATE LOSNO:** In South San Francisco.

2        **PRESIDING COMMISSIONER ENG:** South San

3    Francisco, okay.  Then we have one dated December 12,

4    2006.

5        "My name is Robert Garcia."

6        **INMATE LOSNO:** My son-in-law.

7        **PRESIDING COMMISSIONER ENG:** Oh, okay.  I

8    keep thinking isn't that name familiar, Garcia, in the

9    life crime?

10       **INMATE LOSNO:** Yeah.

11       **PRESIDING COMMISSIONER ENG:** Okay.  I

12   thought oh, okay.

13       **ATTORNEY FOX:** Don't go there.

14       **PRESIDING COMMISSIONER ENG:** "On behalf of

15   my father-in-law.  Okay.  So is Mr. Garcia married to

16   Angelica?

17       **INMATE LOSNO:** They're waiting for me.

18       **PRESIDING COMMISSIONER ENG:** They're

19   waiting?

20       **INMATE LOSNO:** They live together.  They

21   have their own place.  They're waiting for me so they

22   can finally walk down the aisle.

23       **PRESIDING COMMISSIONER ENG:** Oh, so they"re

24   engaged.  So this is your -- okay.  Okay.  Is he the

25   father of her two children?

26       **INMATE LOSNO:** Yes, ma'am.

27       **PRESIDING COMMISSIONER ENG:** Okay.  Okay.

1   Let's see.  I have a letter but there's no date on it
2   from a Gary Christofani, C-H-R-I-S-T-O-F-A-N-I.  Who
3   is this gentleman?
4           **INMATE LOSNO:**  That's one of my brothers in
5   the Overcomer's and my AA.
6           **PRESIDING COMMISSIONER ENG:**  This is a
7   Cairos (phonetic)?
8           **INMATE LOSNO:**  Yeah.
9           **PRESIDING COMMISSIONER ENG:**  Cairos Prison
10  Ministries?
11          **INMATE LOSNO:**  Yes.  He's also participating
12  in our 12-step program.  He's a sponsor and he's been
13  in (indiscernible) I've known him.  He's in San Mateo
14  County, also.
15          **PRESIDING COMMISSIONER ENG:**  Has he been
16  your sponsor?
17          **INMATE LOSNO:**  He's been a sponsor of the
18  group.
19          **PRESIDING COMMISSIONER ENG:** The group?
20  Okay.  So this is a general support letter.  Okay.  We
21  have a letter from a Mr. John Kelly, K-E-L-L-Y, dated
22  November 3, 2006.  He is a brown cardholder at San
23  Quentin.  It says he met you in February 2004 when you
24  were a candidate on a Cairos weekend, an intensive
25  spiritual retreat, of which he was the leader.  So
26  it's a nice support letter.  Recommends you for
27  release.  Got a letter from a Thomas Montgomery,

1   M-O-N-T-G-O-M-E-R-Y, dated November 1, 2006.  This

2   gentleman met you on a spiritual retreat, also with

3   the Cairos in October 2003.  This was a three-day

4   retreat, on which the two of you sat at the same table

5   and became friends.

6           **INMATE LOSNO:**  That's the part that's nice.

7   A three-day retreat makes it sound like we went

8   somewhere but it's right here.  It's a big -- it's a

9   Christian -- it's a beautiful movement.  We look out

10  for each other and get to share a lot of our

11  testimonies.  And matter of fact, we got mail from all

12  over the world for that.  The three days is a life-

13  changing experience on how to get back in step.  That

14  was my first time experiencing that and I had to come

15  back and get back to you guys (indiscernible) them.

16  It was a --

17          **PRESIDING COMMISSIONER ENG:**  What does

18  Mr. Montgomery do?

19          **INMATE LOSNO:**  Tariq (phonetic)?  He's a

20  very good friend.  He's also --

21          **PRESIDING COMMISSIONER ENG:**  Yeah, but what

22  does he do on the outside?

23          **INMATE LOSNO:**  Oh, he's also a sponsor on

24  the street.

25          **PRESIDING COMMISSIONER ENG:**  Okay.

26  Neil Baker, N-E-I-L, Baker, B-A-K-E-R.  No date on it.

27  Mr. Baker is a sponsor for the Overcomer's Anonymous

82

1    Program, a Christian 12-step program here at San

2    Quentin.  Okay.  Certified drug and alcohol counselor.

3    Sees that you're very involved with your group, trying

4    to improve your understanding of the part that drugs

5    and alcohol played in you being incarcerated.  Okay.

6    That's general support.  A letter dated 5/8/06 from

7    Dee Simone, S-I-M-O-N-E.  Known you for four and a

8    half years.  Is this a correctional officer?

9           INMATE LOSNO:  Yes, ma'am.

10          PRESIDING COMMISSIONER ENG:  It's a general

11   support of release letter.  Okay.

12          ATTORNEY FOX:  That's the letter from his

13   dad.

14          PRESIDING COMMISSIONER ENG:  Oh.  Well, this

15   is September of '05 though.

16          ATTORNEY FOX:  That was after our last

17   hearing.

18          PRESIDING COMMISSIONER ENG:  You don't have

19   a updated letter?

20          INMATE LOSNO:  I remember that when they

21   postponed me and I was going to the psyche report and

22   came back again.  They postponed me again after June

23   12.  Sacramento did something so all the State had to

24   postpone the hearings.  And that was the latest one.

25          PRESIDING COMMISSIONER ENG:  Yeah.  This is

26   dated September 14 of '05.  It's over a year old so we

27   generally don't -- I've noted on the record but we

83

 1    generally -- too many things can happen --
 2              **ATTORNEY FOX:**  Yeah.  I under --
 3              **PRESIDING COMMISSIONER ENG:**  -- in a year's
 4    time.  So you know, we -- that's why we always ask
 5    that you have the most updated.  And I do know that we
 6    had postponed you recently, just in the last month for
 7    this date because of your attorney's availability.
 8              **INMATE LOSNO:**  Yeah.
 9              **PRESIDING COMMISSIONER ENG:**  But --
10              **ATTORNEY FOX:**  There was an earlier
11    postponement, as well.
12              **PRESIDING COMMISSIONER ENG:**  I believe the
13    Commissioner put that into the record.  It was back in
14    March.
15              **ATTORNEY FOX:**  So the letter would have been
16    timely at that point.
17              **PRESIDING COMMISSIONER ENG:**  Okay.
18              **INMATE LOSNO:**  My brother's -- I gave my
19    attorney a 60-day planner and they've got all the
20    information that you had just expressed.
21              **ATTORNEY FOX:**  (indiscernible).
22              **PRESIDING COMMISSIONER ENG:**  Okay.  So then
23    I have a May 3, 2006 letter from Rick -- how do you
24    pronounce that?
25              **ATTORNEY FOX:**  Villasenor, V-I-L-L-A --
26              **PRESIDING COMMISSIONER ENG:**  Villasenor.
27              **INMATE LOSNO:**  Yes.

84

1          **PRESIDING COMMISSIONER ENG:**  Okay.
2   V-I-L-L-A-S-E-N-O-R.  I apologize up front for my
3   pronunciation.  And this gentleman is a
4   supervisor/owner of RAV Construction.  So what is he
5   offering you?
6          **ATTORNEY FOX:**  Permanent employment.
7          **PRESIDING COMMISSIONER ENG:**  I'm trying to
8   see where that is.
9          **ATTORNEY FOX:**  Second paragraph, last
10  sentence.
11         **PRESIDING COMMISSIONER ENG:**  Okay.
12             "I would like to give credit to Mr. Losno
13             for his actions and I'm willing to offer
14             Mr. Losno permanent employment opportunity
15             in hopes of his release."
16  Well, okay.  Participation -- what is he specifically
17  offering you, sir?
18         **INMATE LOSNO:**  A job in construction,
19  remodeling.  I would do some work for the
20  (indiscernible) Community Center.  It comes out of San
21  Francisco and send their kids up here.  And I'm
22  working for these kids and through that organization
23  because they've got this gentleman right here and he
24  knows about my programming with them.  I guess they
25  want to give me a job.
26         **PRESIDING COMMISSIONER ENG:**  Okay.  Well,
27  this letter is rather general.  It just says that they

85

1    would like to offer you permanent employment but he

2    doesn't state what that would be.  If that's full-

3    time, part-time, at what type of salary or any other

4    information.  You know, what type of position.  Excuse

5    me.  The Panel generally likes to see letters as

6    specific as possible because it just helps in --

7    because again, the Panel, we're just one part of the

8    whole process.  So that should you be given a date, it

9    goes through a pretty detailed review.  Everything has

10   to be verified.  So the better information you provide

11   up front, the more detailed it is, the better; okay?

12   Because many people can write letters and then we have

13   no idea, what is he really offering you; okay?  And

14   would it be at a salary that's going to allow you to

15   be -- to be able to be financially independent?  The

16   same thing with the support letters for residence.

17   Let me take a quick look at this letter from your

18   father.

19             **ATTORNEY FOX:**  I believe there's an offer

20   about the second or third paragraph down, the first

21   page.

22             **PRESIDING COMMISSIONER ENG:**  Okay.

23             **ATTORNEY FOX:**  And that in the SLO packet

24   that was sent to us.

25             **PRESIDING COMMISSIONER ENG:**  It says that:

26             "I have no much faith in my son's

27             rehabilitation that I am willing to give him

```
 1              a home to live in and assist him in
 2              employment.  He has his bedroom in our home,
 3              which is (indiscernible) in a safe
 4              (indiscernible) environment located in San
 5              Lorenzo."
 6    Okay.  I've got another letter, December 8 of 2006,
 7    signed by a Rudy Corpuz, C-O-R-P-U-Z, Jr., Executive
 8    Director of United Playaz, P-L-A-Y-A-Z.  I'm sorry for
 9    the pronunciation.
10              INMATE LOSNO:  You pronounced it right.
11              PRESIDING COMMISSIONER ENG:  Oh, I did?
12              INMATE LOSNO:  Yes.
13              PRESIDING COMMISSIONER ENG:  Oh, okay.  This
14    is a violence prevention program for youth, who are
15    involved in gangs and other high-risk activities.
16    Okay.  And this gentleman states that he's come to
17    know you through your work with the Choices Program at
18    San Quentin.
19              "Committed to assisting Mr. Losno in gaining
20              employment as soon as he is released on
21              parole.  Also committed to getting Mr. Losno
22              involved in the Extended Opportunity
23              Program; EOPS, to pursue and education at
24              San Francisco City College."
25    That's a nice support letter.  Do you know, has he
26    stated to you anything in particular of how he would
27    help you in gaining employment?
```

1          **INMATE LOSNO:** Yeah. He has the -- his
2   agency is either in downtown San Francisco or
3   (indiscernible) District in San Francisco. I'd go out
4   and become a, like a counselor, talking to the young.
5          **PRESIDING COMMISSIONER ENG:** So that's the
6   employment he's talking about?
7          **INMATE LOSNO:** Yes.
8          **PRESIDING COMMISSIONER ENG:** It would be
9   specific to --
10          **INMATE LOSNO:** His organization.
11          **PRESIDING COMMISSIONER ENG:** Okay.
12          **INMATE LOSNO:** See, he brings the kids up
13   here, too, from San Francisco. So I get them from San
14   Mateo County, San Francisco, Oakland, Richmond; all
15   these neighboring counties. The majority of time
16   they're little gang banging kids. And sometimes being
17   up front with hey, the world is your oyster is not
18   what they gotta hear. So I get at them a little
19   deeper than that and that's why I make a difference.
20          **PRESIDING COMMISSIONER ENG:** That's good.
21   That's good. All right. We've got a letter here
22   dated December 13 of this year from Tony Cheng,
23   C-H-E-N-G. He's a vocational instructor for
24   vocational -- your vocational plumbing class. Let me
25   ask -- oh, okay. Well, let me get through these.
26   Then there was this letter from -- a follow-up letter
27   from Dr. Inaba, I-N-A-B-A, the psychologist, dated

88

1    August 1, 2006.  And I believe that she just clarifies
2    I think what she met by maladaptive personality
3    traits.  So it was in the Board packet, too.  We've
4    got another letter from Potentials Unlimited, dated
5    December 14, 2006, signed by Daniel Archer,
6    A-R-C-H-E-R.  It states that:
7              "Mr. Losno has written us and has been
8              accepted for our sober living homes."  They
9              believe that you're a good candidate.  "And
10             upon release, we can help this gentleman to
11             return to society and be productive and
12             responsible, living clean and sober."
13   Sir, is this a place that you would be residing in?
14   This is an alternative?
15             **ATTORNEY FOX:**  It is an alternative, in the
16   event things don't work out in one of the others.  And
17   also, it would be -- if there's a little transition
18   time out that's needed.
19             **PRESIDING COMMISSIONER ENG:**  And that's what
20   this Potentials Unlimited, they have -- how many beds
21   do they have?
22             **ATTORNEY FOX:**  I don't know that.  I'm
23   sorry.
24             **PRESIDING COMMISSIONER ENG:**  Okay.  Do you
25   have any idea?
26             **INMATE LOSNO:**  No, I don't.
27             **PRESIDING COMMISSIONER ENG:**  So they -- do

89

1   you -- so tell me something about them.  Do they

2   accept people directly from the institutions the

3   minute they -- the inmate is paroled?  They can go

4   directly into the sober living homes?

5           **ATTORNEY FOX:**  If it passes muster with their

6   parole agent.  It takes some planning but they've

7   reviewed Mr. Losno's record and there's space

8   available now.  But it's something that the parole

9   agent would have to satisfy him or herself.

10          **PRESIDING COMMISSIONER ENG:**  How did you

11  find them, sir?

12          **INMATE LOSNO:**  It must have been someone

13  that I met here.  How old is that?  How recent?

14          **PRESIDING COMMISSIONER ENG:**  December 14.

15  They said that you wrote them.

16          **ATTORNEY FOX:**  It was faxed.

17          **INMATE LOSNO:**  It was faxed?

18          **ATTORNEY FOX:**  Yeah.

19          **INMATE LOSNO:**  I can't remember.

20          **PRESIDING COMMISSIONER ENG:**  They said that

21  you wrote them.  Okay.  So you really don't know what

22  they have to offer there?

23          **INMATE LOSNO:**  No, I don't.  All I know is

24  that a lot of programs like this, it's very hard

25  sometimes to answer that question because being a

26  lifer, it's always indecisive.  Is it yes?  Is it no?

27  It's like jobs sometimes.  They can be out

90

1  (indiscernible) for short times not knowing if the
2  Board says yes.
3          **PRESIDING COMMISSIONER ENG:** Okay.  I think
4  I already read this one from John Kelly.
5          **ATTORNEY FOX:** Yes, you did.
6          **PRESIDING COMMISSIONER ENG:** Yes, I did.
7  Okay.  Then this other one, a general support from
8  Rose Nieto, N-I-E --
9          **ATTORNEY FOX:** Oh, no.  I'm sorry.  That
10 might be for another case.
11         **INMATE LOSNO:** No.
12         **ATTORNEY FOX:** Oh, I'm sorry.
13         **INMATE LOSNO:** I know her, too.
14         **PRESIDING COMMISSIONER ENG:** Okay, go ahead.
15         **PRESIDING COMMISSIONER ENG:** Yeah, this -- I
16 don't --
17         **ATTORNEY FOX:** I'm not confused, too.
18         **DEPUTY COMMISSIONER STAR:** I've had the
19 confusion, Ms. Fox, but I read it.
20         **PRESIDING COMMISSIONER ENG:** Oh, this is
21 your relative.  We're so -- yes.
22         **ATTORNEY FOX:** Right.
23         **PRESIDING COMMISSIONER ENG:** This is rose
24 Nieto and she does say that she's sending this letter
25 concerning Rafael Alberto Losno.  Okay.  And it is a
26 general support letter.  It's not dated but we did get
27 it in the packet.  I guess she resides in South San

1   Francisco.  We talked about this one.  Have I missed
2   any?

3           **ATTORNEY FOX:**  We had some general support
4   letters from the University of California Legal
5   Guardian, a philosophy case -- or case -- class that
6   Mr. Losno was enrolled in and performed well in.  And
7   also a class he successfully completed at USF.  But
8   again, the dates are somewhat old.  The USF one is
9   December 30 of '05 and the Berkeley one is January 12
10  of this year.  Also, in our packets is another letter,
11  January 3 of '06 from Carlos Tello (phonetic) and
12  that's a general support letter.  And then February
13  23, Pat Carreros (phonetic) writes a letter of
14  support.  Support once he gets out and also a
15  townhouse that Mr. Losno could live in.  It's in the
16  Notices section of the SLO packet.

17          **PRESIDING COMMISSIONER ENG:**  There are so
18  many --

19          **ATTORNEY FOX:**  I know.

20          **PRESIDING COMMISSIONER ENG:**  -- letters in
21  here and they were all mixed up between 2005 and 2006
22  and they were all mixed up.  But I thought that's why
23  I took your most current.  Because 2005, to be honest,
24  I didn't even look at because there were so many
25  others.

26          **ATTORNEY FOX:**  Oh, okay.

27          **PRESIDING COMMISSIONER ENG:**  And I felt that

92

1  they were a little too outdated. But that's why I'm

2  asking.

3         **ATTORNEY FOX:** Right.

4         **PRESIDING COMMISSIONER ENG:** That's why your

5  attorney is stating the ones that she feels are

6  necessary to put into the record.

7         **INMATE LOSNO:** Okay.

8         **ATTORNEY FOX:** And then March 1 from one of

9  the corrections officers here, a A. Duenas,

10 D-U-E-N-A-S, which is a letter of support and shows

11 that he supports constructively other inmates in the

12 institution. And then there's a letter dated February

13 17 of this year; Mission Neighborhood Centers, which

14 offers general support. And I don't know if you have

15 those in so I apologize.

16        **PRESIDING COMMISSIONER ENG:** I don't think

17 so.

18        **ATTORNEY FOX:** I don't mean to --

19        **PRESIDING COMMISSIONER ENG:** Because I would

20 have recognized them. Yeah, okay.

21        **DEPUTY COMMISSIONER STAR:** I don't think I

22 have them, either.

23        **PRESIDING COMMISSIONER ENG:** Yeah. I did --

24 I didn't recognize those.

25        **ATTORNEY FOX:** And there is a job

26 description and I know you're saying 2005 you wouldn't

27 consider. But this is dated December 26 so it's very

93

1   close and it is a job offer with the salary and hours

2   per week.

3          **PRESIDING COMMISSIONER ENG:**  I did see that,

4   as a translator?

5          **ATTORNEY FOX:**  Yes.

6          **PRESIDING COMMISSIONER ENG:**  Okay.

7          **ATTORNEY FOX:**  I just wanted to be sure.

8          **PRESIDING COMMISSIONER ENG:**  I did see that.

9   I was going to ask you about that, even though it's a

10  year old and I didn't notice any reference to this

11  particular company, even in the March Board Report.  I

12  wanted to see if you were going to raise that.  So

13  that's why I thought, okay, it's probably not relevant

14  any longer because it was not notated in here for

15  employment in the --

16         **INMATE LOSNO:**  In my Counselor's Report?

17         **ATTORNEY FOX:**  Yes.  Yeah.  And it's very

18  good because this one, this letter dated December 26

19  from Cal Meca, M-E-C-A, Group, unless I missed

20  something, the salary is $10.50 per hour for 40 hours

21  per week as an office assistant.  Helping with filing,

22  answering phones, et cetera.  And it's signed by

23  Maria Carty, C-A-R-T-Y, Immigration Counselor.  And do

24  you know who this person is?

25         **INMATE LOSNO:**  Yeah, she's my aunt.

26         **PRESIDING COMMISSIONER ENG:**  Oh, it's your

27  aunt.  Okay.

1    just barely.  It's December and this was in
2    anticipation of the February, I think, Board.  This is
3    a job offer from Alvarado Tax and Accounting Services
4    for translation during business meetings, telephone
5    questions and during tax preparations.  Monday through
6    Saturday in the tax season and the rest of the
7    calendar year his schedule would be Monday through
8    Friday.  Starting pay last year was $13.00 per hour, a
9    bonus at the end of the scheduled tax season month.
10   And there's a discussion of the sort of support that
11   would be available aside from just the job.  Would you
12   like my copy?

13            **PRESIDING COMMISSIONER ENG:**  Yeah.  Sir,
14   what's your first choice?

15            **INMATE LOSNO:**  You know what?  I'm probably
16   -- these jobs, I owe them all services to Alvarado Tax
17   and Company for me because they've been supporting me
18   for a long time.  They've waited for me.  My aunt,
19   also.

20            **ATTORNEY FOX:**  And before you finish
21   answering, there is another job offer from December
22   13, again of last year but again, it was just on the
23   cusp of being timely for our last hearing, which is
24   Bumblebee Construction.  And he would be a laborer,
25   working at $15.00 an hour Monday through Friday and I
26   can give you that copy, as well.

27            **PRESIDING COMMISSIONER ENG:**  You know, I

96

 1   don't recall seeing these in here.

 2           **ATTORNEY FOX:**  Well, they were in mine.

 3           **DEPUTY COMMISSIONER STAR:**  They were in the

 4   -- I saw them in the packet; the construction and the

 5   tax letter.

 6           **PRESIDING COMMISSIONER ENG:**  Okay.  Because

 7   I was specifically looking for --

 8           **DEPUTY COMMISSIONER STAR:**  Here we go.

 9   Okay, everybody.  Hold on while I change this tape.

10   [TAPE 2 SIDE 2]

11           **DEPUTY COMMISSIONER STAR:**  Side B, tape two

12   for the parole hearing for Rafael Losno, C Number

13   73252 and we're back on record.

14           **ATTORNEY FOX:**  They're not always in

15   chronological order.

16           **PRESIDING COMMISSIONER ENG:**  Okay.  All

17   right.

18           **DEPUTY COMMISSIONER STAR:**  I'll show you

19   mine.

20           **PRESIDING COMMISSIONER ENG:**  That's all

21   right.  I finally found it.  It was like mixed up in

22   all these old ones.  Okay.

23           **ATTORNEY FOX:**  Um-hum.

24           **PRESIDING COMMISSIONER ENG:**  But again,

25   those are a little outdated so it does concern us.

26           **ATTORNEY FOX:**  Well, in the event the Panel

27   would be willing to find Mr. Losno suitable, this is

97

1    something that the Parole Department hits the street

2    on almost immediately, to verify what we have said.

3              **PRESIDING COMMISSIONER ENG:**  Right.

4              **ATTORNEY FOX:**  Just to make sure.  And in

5    the event any of it is not valid, there's no date.

6              **PRESIDING COMMISSIONER ENG:**  But sir, okay.

7    One concern right off the bat is that you state that

8    you would -- we have one letter from your father, even

9    though it's outdated, and that's in San Lorenzo.

10   These jobs are all in San Mateo or (indiscernible).

11             **INMATE LOSNO:**  That's in East Bay.

12             **PRESIDING COMMISSIONER ENG:**  Okay.  How far

13   is that to San Lorenzo?

14             **INMATE LOSNO:**  Oh, a few miles.  It's not

15   that far.  It's right at the freeway, right by the old

16   coliseum going north.

17             **DEPUTY COMMISSIONER STAR:**  Well, it's about

18   30 to 45 minutes away from San Lorenzo.

19             **PRESIDING COMMISSIONER ENG:**  Okay.  So how

20   would you get around?

21             **INMATE LOSNO:**  If it was at my dad's?

22             **PRESIDING COMMISSIONER ENG:**  Um-hum.

23             **INMATE LOSNO:**  (indiscernible) San Lorenzo

24   (indiscernible) is right down five blocks from my

25   dad's, if I remember.  It's still there and at the

26   plaza.  My cousin lives right there (indiscernible) so

27   it's not far at all.  And the reason why San Mateo

98

1  County, all the jobs like I had mentioned before, all
2  my family is (indiscernible). My full purpose would
3  be for my mom.
4        **PRESIDING COMMISSIONER ENG:** Okay.
5        **INMATE LOSNO:** But that would be basically
6  said there.
7        **ATTORNEY FOX:** And also, there's a letter
8  from his mother, Maria Del Castillo. Did you not see
9  that one, offering a place to live?
10       **PRESIDING COMMISSIONER ENG:** What's the
11  date?
12       **ATTORNEY FOX:** It's undated.
13       **PRESIDING COMMISSIONER ENG:** I think that's
14  why I didn't look at it.
15       **ATTORNEY FOX:** Oh, well, it says -- yeah, it
16  was March.
17            "My son now appears before you this March of
18            '06 so it would have been before."
19  I don't think there's a reason to doubt you.
20       **PRESIDING COMMISSIONER ENG:** I'm going to
21  have to go through them.
22       **ATTORNEY FOX:** I'm sorry. But it is there.
23       **PRESIDING COMMISSIONER ENG:** Okay. Sir, you
24  did a very good outline of what your plans are. In
25  terms of financial support and maybe I did read the
26  letter from your mother. I can't recall but I don't
27  recall seeing -- even scanning over anything where

99

```
 1    anybody was stating that they were going to give you
 2    any type of financial support.  And as you already
 3    know, that once an inmate gets a date and is released,
 4    you're going, you know, to go through a pretty
 5    significant transition.  And that often, even though I
 6    know -- I think you have two different job offers for
 7    your translation services.  One is at like $10.00,
 8    $10.50 and hour and the other one was at $13.00.  That
 9    could be difficult to survive on for a while.  So the
10    Panel usually likes to know what additional financial
11    support you might have.  In other words, everything as
12    detailed -- as much detail as possible that shows the
13    Panel that you have thought about all possibilities,
14    so that -- because it's difficult when somebody gets
15    out.  When somebody's been incarcerated for a long
16    time, jobs are not that easy to come by, all right?
17    And things have changed an awful lot on the outside
18    and it's very, very expensive to live.  So how are you
19    going to get by and be able to do all the things that
20    you have to do?  And you're talking about if you're
21    over in the East Bay and traveling back over to San
22    Mateo County or into San Francisco and all the way
23    around, how are you really planning to do that
24    logically?  And I understand what you say by BART but
25    to get over to San Mateo, BART doesn't go into San
26    Mateo unless you go via San Francisco and then --
27              INMATE LOSNO:  Well, my family is out there
```

100

1    to support me with all of that but my father is the

2    one.  See, that's why when I say if I had to choose,

3    it would be with my dad because my dad -- there's a

4    reason why he lives how he lives, you know.  And --

5              PRESIDING COMMISSIONER ENG:  How old is he?

6              INMATE LOSNO:  My dad is 73.

7              PRESIDING COMMISSIONER ENG:  Is he still

8    driving or does he have health problems?

9              INMATE LOSNO:  He drives.  He doesn't like

10   driving long distances but he drives.  He comes up

11   every two weeks.  But he's the reason why, because the

12   house is a big house.  I have my own room there.  I

13   left that when I was living out there.  He's well off.

14   And my brothers, they work (indiscernible).  My

15   sisters and one of them even offered me a car but I

16   can't drive without first reading the book.  So I

17   know.  I know that it's hard.

18             PRESIDING COMMISSIONER ENG:  That's true.

19             INMATE LOSNO:  I know it's a hard transition

20   but I'm a fighter.  You know, (indiscernible).

21             PRESIDING COMMISSIONER ENG:  So have I

22   missed anything?  Anything else that you want to add?

23   We recognize that he has a lot of support letters but

24   I do want to add anything that's more specific

25   regarding employment or residential or financial

26   support, et cetera.

27             ATTORNEY FOX:  I think we've covered what

101

1   exists.

2           **PRESIDING COMMISSIONER ENG:**  Okay.

3   Satisfied with that, Mr. Losno?

4           **INMATE LOSNO:**  Yes.  I just want you to know

5   that my dad is there.  He's the one -- I -- it sounds

6   selfish but he -- you know, it's like you said.

7   You're right.  It is expensive.  It is difficult.

8   Everything's difficult and you have to try.  I mean,

9   I'm not -- it might sound boldly cold but my dad's

10  willing.

11          **PRESIDING COMMISSIONER ENG:**  Okay.

12          **INMATE LOSNO:**  And I need him.  My dad will

13  support me.

14          **PRESIDING COMMISSIONER ENG:**  Okay.  Well, we

15  went out Penal Code Section 3042 Notices and those

16  notices go to agencies that have a direct interest in

17  your case.  And I didn't see in our packets that we

18  had any letters in response.  However, we do have a

19  representative of the San Mateo County District

20  Attorney's Office, who is present, who I'm sure will

21  be making a statement regarding your parole

22  suitability prior to us going into our deliberations.

23  So I'm going to ask Commissioner Star if she has any

24  further questions to ask you right now?

25          **DEPUTY COMMISSIONER STAR:**  No, none.

26          **PRESIDING COMMISSIONER ENG:**  All right.  At

27  this point in time, I'm going to ask the

102

1    representative from the District Attorney's Office,

2    Mr. Good, if he has any questions he would like posed

3    to Mr. Losno through the Chair?

4        **DEPUTY DISTRICT ATTORNEY GOOD:** I -- yes,

5    thank you. Yeah, just a few questions about your life

6    offense, Mr. Losno. And I pose them to you?

7        **PRESIDING COMMISSIONER ENG:** Correct.

8        **DEPUTY DISTRICT ATTORNEY GOOD:** All right.

9    I noticed from reading the Sentencing Hearing that

10   there was a statement by the Prosecutor, Mr. Wagstaff

11   (phonetic), who said that both Mr. Garcia and Mr.

12   Bustamonte said that Mr. Losno was the leader of the

13   group. I'm just wondering, does he believe he was the

14   leader of the group that day?

15       **PRESIDING COMMISSIONER ENG:** Do you

16   understand that question, Mr. Losno?

17       **INMATE LOSNO:** Yes, I do.

18       **PRESIDING COMMISSIONER ENG:** Okay. Please

19   respond to the Panel.

20       **INMATE LOSNO:** No. I was not the leader of

21   the group. I just followed the group of guys that

22   came out the car.

23       **PRESIDING COMMISSIONER ENG:** Direct your

24   response to the Panel.

25       **INMATE LOSNO:** Oh. I just followed the guys

26   that came out of the front seat. I was in the back

27   seat. I followed the older guy, too.

1        **PRESIDING COMMISSIONER ENG:**  Why would they
2    state that they thought you were the leader?
3        **INMATE LOSNO:**  Maybe because I was bigger.
4    I was bigger than everyone in the car.  As I stated
5    earlier, Mr. Garcia was older but I was bigger.  I
6    stood out.
7        **DEPUTY COMMISSIONER STAR:**  How much older
8    was Garcia?
9        **INMATE LOSNO:**  I think he was in his
10   twenties.  He had just got out of Tracy DBI.
11       **DEPUTY COMMISSIONER STAR:**  Who got out
12   first?
13       **INMATE LOSNO:**  The front members of the car.
14   Chino, which is Mr. Garcia.  Spanky was Mr. Bustamonte
15   and myself.
16       **DEPUTY DISTRICT ATTORNEY GOOD:**  I also see
17   in the Sentencing Hearing that the Prosecutor says
18   that both Mr. Bustamonte and Mr. Garcia say that
19   Mr. Losno swung a baseball bat at the head of the
20   victim.  I wondered if Mr. Losno believes he did swing
21   at the head of the victim?
22       **INMATE LOSNO:**  More than likely so.  I
23   probably hit him in the head, too.  I can't remember.
24   It was all fast.  I was impaired, too.  Like I said
25   earlier, we were drinking.  I can't actually remember
26   me striking him in the head but I believe that
27   anything is possible that day.  I probably did it, I

1    just don't remember but it's possible.

2              **PRESIDING COMMISSIONER ENG:**  Okay.

3              **INMATE LOSNO:**  More than likely so.

4              **PRESIDING COMMISSIONER ENG:**  Okay, Mr. Good.

5              **INMATE LOSNO:**  In his statement he made to

6    the Probation Department back in '83, he seems to make

7    a statement where he says -- he does make a statement

8    where he says that:

9              "Before Chino struck the guy, I hit him in

10             the legs."

11   So it sounds like that he was the first person to

12   strike the victim.  Is that correct?

13             **PRESIDING COMMISSIONER ENG:**  Sir?

14             **INMATE LOSNO:**  I can't remember who got

15   there first but I remember, like I said earlier, I hit

16   him in the legs.  I hit him in the ankles.  And he

17   said, "Okay, that's it."  And that's when I started to

18   walk away and I ran back to the car.

19             **PRESIDING COMMISSIONER ENG:**  So you don't

20   recall what -- was Mr. Ruiz down on the ground when

21   you first struck him or was he standing?

22             **INMATE LOSNO:**  No.  He had just tumbled

23   over.  He had just fallen running from all of us

24   coming out of the car.

25             **PRESIDING COMMISSIONER ENG:**  All right.  So

26   he fell down and you proceeded to immediately strike

27   him?

105

1          **INMATE LOSNO:**  No, we chased him.  He ran.
2    We ran after him.
3          **PRESIDING COMMISSIONER ENG:**  But he fell
4    down.
5          **INMATE LOSNO:**  He fell down.
6          **PRESIDING COMMISSIONER ENG:**  And then you --
7          **INMATE LOSNO:**  And then we got there.
8          **PRESIDING COMMISSIONER ENG:**  And you
9    approached him and while he was down, you hit him?
10         **INMATE LOSNO:**  Yes.
11         **PRESIDING COMMISSIONER ENG:**  But you do not
12   recall, or do you, if you hit him first?
13         **INMATE LOSNO:**  No, because I was in the back
14   seat.  The first two guys.  I was in the back seat.
15   The two cars --
16         **PRESIDING COMMISSIONER ENG:**  But you ran
17   after him.  He had already fallen down.
18         **INMATE LOSNO:**  Right.
19         **PRESIDING COMMISSIONER ENG:**  The three of
20   you approached Mr. Ruiz while he was on the ground and
21   proceeded to hit him.
22         **INMATE LOSNO:**  Right.
23         **PRESIDING COMMISSIONER ENG:** So who hit
24   first?
25         **INMATE LOSNO:**  Chino hit him first.
26         **PRESIDING COMMISSIONER ENG:**  And --
27         **INMATE LOSNO:**  Mr. Garcia.

106

1       **PRESIDING COMMISSIONER ENG:** Mr. Garcia hit
2   him first?

3       **INMATE LOSNO:** Yes.

4       **PRESIDING COMMISSIONER ENG:** Or did it
5   happen very, very quickly where all three of you were
6   hitting?  What happened?

7       **INMATE LOSNO:** It happened very, very
8   quickly but I followed them, so they got there first.
9   Mr. Bustamonte ran towards the store, towards the guy.
10  The guy was coming out of the store so that's when --
11  it happened so fast.  Just from there, we just started
12  (indiscernible).

13      **DEPUTY DISTRICT ATTORNEY GOOD:** If the Chair
14  could ask him, which of the people had the golf club?
15  It's not clear to me.

16      **PRESIDING COMMISSIONER ENG:** Who had the
17  golf club?

18      **INMATE LOSNO:** Mr. Garcia had the golf club.

19      **PRESIDING COMMISSIONER ENG:** He did?  All
20  right.

21      **DEPUTY DISTRICT ATTORNEY GOOD:** All right.
22  And I'm curious, if the Chair could ask him,
23  apparently he failed to appear for his sentencing for
24  about 20 months.  The Court had given him two weeks to
25  get married yet he didn't appear for 20 months.
26  What's the reason he didn't appear for 20 months for
27  his sentencing?

1          **PRESIDING COMMISSIONER ENG:**  What happened?
2          **INMATE LOSNO:**  I did go.  I did appear and I
3   was sentenced.  And they were discussing seven -- I
4   mean, five, seven, eleven years and they sentenced me
5   to 15 years to life.  There was a discussion I started
6   having with my attorney.  Mr. Jenkins, the judge, he
7   got up and noticed that we were speaking and he asked
8   what was the problem.  When I asked him, he gave me
9   two weeks to get married.  He told me to go home.  I
10  went home.  He gave me two weeks to turn myself in.  I
11  turned myself in at the (indiscernible) City/County
12  Jail and I forgot what floor it was where you go
13  through the booking process.  I told them who I was
14  and I waited.  They told me to go home due to the fact
15  that my paperwork was sent to the California Youth
16  Authority because the Judge had recommended me to go,
17  supposedly, to the Youth Authority, which I didn't
18  know.
19         **PRESIDING COMMISSIONER ENG:**  Even though you
20  were 19?
21         **INMATE LOSNO:**  I was 19.
22         **PRESIDING COMMISSIONER ENG:**  Or 20 at the
23  time?
24         **INMATE LOSNO:**  I had just turned 19.  And
25  the reason why he recommended that, because I had no
26  previous arrests or record, juvenile or -- I'd never
27  been incarcerated in my life.  So he recommended me to

1    go to CYA.  He had said if they were to accept me, I'd
2    go to CYA but he had to sentence (indiscernible) to
3    sentence me to this sentence.  He let me go home.
4    Like I told you earlier, I went to go turn myself in.
5    They -- the Sheriff's Department told me to go back
6    home because they didn't have my paperwork, due to my
7    paperwork being sent to CYA.

8            **PRESIDING COMMISSIONER ENG:**  Mr. Good?
9            **DEPUTY DISTRICT ATTORNEY GOOD:**  All right.
10   I'm curious then, when he did -- if they didn't have
11   his paperwork, after two weeks did he make any attempt
12   to contact the Court in the next 20 months?  Or did he
13   wait until he actually was apprehended?

14           **INMATE LOSNO:**  I spoke to my attorney, my
15   attorney at the time.  His response was wait, leave.
16   I just stood there at that time.  My second -- Maria
17   was pregnant with my second daughter and I did not
18   call the court or call the County Jail to say hey, I'm
19   still out here.  I was living in San Lorenzo at the
20   time and (indiscernible) soon to be born.  And at that
21   time, I was just too afraid that I was going to call
22   the department -- the police to come and get me, you
23   know.  I just stayed there.

24           **PRESIDING COMMISSIONER ENG:**  So are you
25   saying that your attorney had advised you to just
26   wait?

27           **INMATE LOSNO:**  Wait and --

1          **PRESIDING COMMISSIONER ENG:**  Or leave?

2          **INMATE LOSNO:**  Or leave and I just stood

3     there.

4          **PRESIDING COMMISSIONER ENG:**  Like leave the

5     state?

6          **INMATE LOSNO:**  Leave.  I just stood there

7     and I went back to my mom's house and took my

8     daughter's with me.

9          **PRESIDING COMMISSIONER ENG:**  So when did

10    they -- did the police finally show up?

11         **INMATE LOSNO:**  The police came and they

12    arrested me at my house, at my mom's house, after 20

13    months.

14         **DEPUTY COMMISSIONER STAR:**  Was there a

15    warrant out there for you at that time?

16         **ATTORNEY FOX:**  If I may quote from the

17    Sentencing transcript, Mr. Palacios (phonetic) was

18    Mr. Losno's attorney.

19         **INMATE LOSNO:**  That was my attorney.

20         **ATTORNEY FOX:**  And in the question from the

21    judge, it says:

22              "You advised him there was no further

23    obligation to report in."

24    This is page four, line 25 is the response.

25              "No, Your Honor.  At that point, as I

26              understood it, he was still out on bail.

27              Subsequently, I found out the bail had even

110

1              been exonerated.  They knew that.  The
2              family apparently became aware of that.
3              Even so, this man has not fled, Your Honor.
4              His obligation to remain available to the
5              Sheriff of this County.  I think he
6              fulfilled that.  That is what he was told to
7              do.  That's what he did do."
8    So on advice of counsel --
9              **PRESIDING COMMISSIONER ENG:**  Which is
10   exactly what Ms. Losno said.  Okay, Mr. Good?
11             **DEPUTY DISTRICT ATTORNEY GOOD:**  I believe,
12   though, in spite of that Mr. Losno know -- knew by
13   reading the newspaper that he was wanted by the
14   authorities and still didn't turn himself in.  Is that
15   correct?
16             **PRESIDING COMMISSIONER ENG:**  Sir, is that
17   correct?
18             **INMATE LOSNO:**  What, reading the newspapers?
19   I didn't turn myself in because I was scared to go to
20   jail.  And my -- (indiscernible) was born and I mean,
21   I'm in love with my girl.  I had my -- both my
22   daughters.  At that time, when my grandfather passed
23   away.  There's no way of thinking back then am I going
24   to be calling the police to come and get me and take
25   me to prison.  And it sounds -- I mean, it was wrong
26   but at that time (indiscernible).  I'm a kid in love
27   with my daughter -- my girl and I have my daughters

1    and there was no way I'm going to say come take me to
2    jail and to be torn away from them.  Now, of course,
3    it would be different.  I mean, I'm a mature, grown
4    man.  I know what's right and wrong but back then, I
5    wasn't about to.  I had my daughters with me.  I had
6    my kids.  I was still -- it wasn't like I was out
7    there running around or anything.  I was stuck in a
8    little room, even smaller than these cells right here.
9    Pale and afraid to come out of anywhere.  I just -- I
10   was already re-incarcerated, which was being
11   incarcerated in a little room.

12        **DEPUTY DISTRICT ATTORNEY GOOD:**  Thank you.
13   That's all I have.

14        **PRESIDING COMMISSIONER ENG:**  Okay.
15   Counselor, do you have any questions to ask your
16   client?

17        **ATTORNEY FOX:**  No, no questions.  Thank you.
18        **PRESIDING COMMISSIONER ENG:**  I hate to do
19   this but I've got to go back to some of your
20   responses.  I don't feel that you've explained to this
21   Panel, okay, or given us an indication of what you
22   feel are really the causative factors that led you to
23   kill this young fellow or any indications of that.
24   Your pregnant girlfriend was sitting there.  Another
25   person, who was an active gang member in a gang stayed
26   in the car.  Yet, you got out and chased him and beat
27   him, along with the other two people.  What drove you

112

1   to do that?  And did you ever think about

2   (indiscernible) at that time either?

3           **INMATE LOSNO:**  As soon as that happened, my

4   door opened, I did not think of anything.  I went with

5   -- it's -- there's no explanation.  I went with the

6   flow, just without thinking, just reacted.  And it

7   wasn't adrenaline.  It wasn't deciding not to want to

8   be part of the group.  I wasn't thinking.  That's just

9   it.  I wasn't thinking at that moment and I decided to

10  follow suit.  It wasn't that I still had any type of

11  feelings for the gang.  No -- was it the adventure at

12  that time?  Yeah.  Did someone see that, I mean,

13  happening?  No.  Did I stop and think that someone was

14  actually going to be killed and go that far?  No.  So

15  you know, knowing what peer pressure is, knowing what

16  stupidity is and to follow the crowd, that's what I

17  did.  It wasn't done -- like I said, it wasn't

18  thought.  I wasn't like let's go get Jorge.  Let's --

19  it was just a spontaneous reaction, being ignorant,

20  being stupid, you know.  And he didn't deserve that.

21  Not only him but his family, that area, that whole

22  community.  Myself, my family.  It hit everything

23  else.  I know different now.  I mean, that's what I do

24  now.

25          **PRESIDING COMMISSIONER ENG:**  Okay.  We're

26  going to move onto closing statements and we're going

27  to pass it on up to Mr. Good.  Closing statements?

113

1          **DEPUTY DISTRICT ATTORNEY GOOD:**  I think,
2     based on everything that I've heard, I don't really
3     think our office is going to take a position in this
4     case.  I think I'll just say briefly, I don't think
5     Mr. Losno is being entirely forthright about what
6     happened in the crime because he was saying in 1983
7     that he was the first one that struck the blow, it
8     seems.  Yet I can't help be impressed with everything
9     he's done since then, especially recently.  That's all
10    I have to say.

11         **PRESIDING COMMISSIONER ENG:**  Okay.
12    Counselor?

13         **ATTORNEY FOX:**  Thank you.  Normally at this
14    time I say I respectfully disagree with my colleague.
15    However, I would only encourage him to perhaps find
16    Mr. Losno suitable.  And I would ask this Panel to
17    find Mr. Losno suitable because he is.  He does not
18    pose an unreasonable risk of danger to the public.  In
19    fact, he would be an asset to any public community
20    where he would find himself.  He has been through a
21    period of adjustment with his last 128-A, yeah, 14
22    years ago and that's a counseling chrono.  It's not a
23    disciplinary write-up.  His last disciplinary write-up
24    was over 18 years ago and I think that's a remarkable
25    accomplishment, having been in the various
26    institutions he's been in.  He stays busy and
27    continues to improve himself, even though the Panel

114

1    doesn't always ask him to do that.  He has sought out
2    a new plumbing vocation and he wasn't asked to do that
3    last time.  And he does give back to his community.
4    The Board Report is supportive.  The Psychological
5    Evaluation is supportive, as well, by Dr. Inaba.  And
6    I think it's important in that regard to note that
7    Mr. Losno does use accepted dispute resolution
8    techniques insofar as he sought out Dr. Inaba to
9    correct what he felt were errors in an earlier report.
10   And in fact, those errors were corrected but he did
11   that in a peaceful, acceptable way.  He has been the
12   victim of a stabbing for refusing to go along with
13   gang activities in the institution, not that that
14   alone would qualify him for parole.  But I think it
15   conveys that this is a man now, not a youngster, who
16   is before you and is willing to stand on his own two
17   feet, make his own judgments and proceed in a peaceful
18   way and a productive way.  Turning to his parole
19   plans, Mr. Losno has broad parole plans.  He enjoys
20   the continued, sustained support of his family and
21   that's his mother, his father, brother, sister, as
22   well as his offspring.  And they're not going to let
23   him fail and he's not going to fail them.  He loves
24   them and by their sustained support over the years,
25   they've demonstrated that they love him, too, in spite
26   of everything that happens; visiting, moving and all
27   that in the prison environment.  And I -- the words I

115

1    heard Mr. Losno speak earlier today was that he waits

2    for Friday.  Well, we wait for Friday and we think

3    well, that's the end of the week.  We're going to

4    watch football.  We're going to have a beer; whatever

5    it is.  But Mr. Losno waits for Friday because that's

6    when he gets to tutor the youth and I think that

7    speaks volumes about the man.  So it would be

8    appropriate to find Mr. Losno suitable.  I ask the

9    Panel to do that and I'll submit, unless there's

10   anything that Mr. Losno cares to add.

11          **PRESIDING COMMISSIONER ENG:**  Okay.

12   Mr. Losno, this is your chance, if you choose to, to

13   give a final statement regarding your parole

14   suitability.

15          **INMATE LOSNO:**  I believe I should be found

16   suitable because I know what I'm doing in prison.  I

17   know why I'm here and the significance of my crime and

18   what I did.  I know the value of life.  I know what

19   I'm doing in prison right now and what the definition

20   of murder is.  I live with this.  It's part of my

21   shadow every day.  I know what I'm doing in prison.  I

22   know there was a life taken.  I think about this

23   because I think of my younger brothers.  I think of

24   what could have happened to them, just sitting or

25   standing anywhere innocently and being attacked by

26   someone like that.  And then again, everything that

27   I've experienced and thinking of Jorge and his mom and

116

```
 1   I remember her (indiscernible) words and I took heed
 2   to all of that.  And knowing what I know now and
 3   knowing the definition, knowing exactly what
 4   (indiscernible) what led me to prison.  Everything
 5   that I've learned, with the tools that I've learned
 6   here with all these programs and just witnessing how
 7   life -- how fragile life is in here, there's no way I
 8   would ever return back to prison.  I don't want to be
 9   wearing orange.  I call them -- that's what I
10   (indiscernible).  I don't want to be (indiscernible)
11   that migrate here every other week.  I would be the
12   biggest hypocrite in the world, me coming back,
13   knowing after 25 years I can't see myself like that.
14   And that's why I give back to the kids and that's what
15   I want to do.  These jobs that have offered me money
16   to work for them; even if they paid $27 an hour, $30
17   an hour.  What I want to do now is to do a children's
18   program and being a facilitator and from what I've
19   heard now, it's an organized program on the streets.
20   It's been brought to my attention that you start out
21   with $2,500 a month.  I would take that because I
22   enjoy doing what I'm doing with the kids, even if I
23   did get $30 an hour at some other job.  I want to get
24   back to my family.  I feel bad for what happened
25   (indiscernible).  It's not only there in San Francisco
26   County or the Ruiz family, my family.  There's more
27   people now who are suffering.  There's my grandkids.
```

117

1    And that's why I continue to put forth all my energy.
2    I want my grandson, my granddaughters -- I have three
3    granddaughters and a grandson.  And with the kids that
4    I get here every week, there's no way that I'd ever
5    come back.  I put my life on the line in here and
6    other places and I stand firmly.  I turned my life
7    over to (indiscernible) now and I'm against a lot of
8    stuff and I walk alone now.  Me and these guys that at
9    one time I considered good friends; no more.  I've
10   been casted out to sea.  I stay in the room by myself.
11   I walk with myself and I continue to -- I like it like
12   that.  I don't need no one to watch my back or for
13   protection.  I don't need anyone to hang around.  I'm
14   happy doing what I'm doing, working with kids.  My
15   desire is to go home and help raise my grandkids since
16   I couldn't do that with my daughters.  Because there's
17   no way that I'll forget why I'm in prison.  I've never
18   been incarcerated at any level of my life.  There's a
19   big difference.  I wish I would have learned a lot
20   earlier, maybe doing something else, so I would know
21   the significance of what it is to wear a pair of
22   handcuffs.  And I had to learn about the biggest crime
23   of all, it's 187.  There's no way.  I would never,
24   never raise my hand to anyone else and I haven't since
25   that day.  I'd rather receive the blows.  To other
26   people, it might sound cowardly or weak.  Or even a PC
27   case (indiscernible).  I'd rather receive that.  I

118

1    don't want to ever be involved in that type of

2    scenario and I don't want to ever hurt anyone else

3    again.  But it's my desire to get back to the

4    community and I know I would be an asset out there.  I

5    know I can change and I know that because part of Ruiz

6    memory hasn't gone or been forgotten.  I still keep

7    that.  That's one of my most (indiscernible).  That's

8    why I keep on pulling forward.

9           PRESIDING COMMISSIONER ENG:  Okay.  Anything

10   else?

11          INMATE LOSNO:  That's it.

12          PRESIDING COMMISSIONER ENG:  We'll now

13   recess for deliberations.  The time is 3:58.

14                   R E C E S S

15                    --o0o--

16

17

18

19

20

21

22

23

24

25

26

27

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER STAR:**  Okay, we're on

4    record.

5          **PRESIDING COMMISSIONER ENG:**  Okay.  The time

6    is now 4:22.  And for the record, everyone who was in

7    the room prior to deliberations has since returned in

8    the matter of Rafael Losno.  The Panel has reviewed

9    all of the information received and relied on the

10   following circumstances in concluding that the

11   prisoner is not suitable for parole and would pose an

12   unreasonable risk of danger to society or a threat to

13   public safety if released from prison.  The Panel

14   finds that the commitment offense was carried out in a

15   very cruel and callous manner, as the victim, a

16   15 year old, was basically beaten to death with

17   baseball bats and a golf club, as he was -- after he

18   had tripped and fallen to the ground.  It was carried

19   out in a very dispassionate and calculated manner, as

20   Mr. Losno said himself that they were riding in a car

21   and the car turned around after some hand signals,

22   gang hand signals went back and forth.  And I believe

23   it was three of the folks from Mr. Losno's car got out

24   of the car armed and went after two people from the

25   other gang, one of which was the victim, the 15 year

26   old victim.  Carried out in a manner, which

27   **RAFAEL LOSNO   C-73252   DECISION PAGE 1   12/18/06**

1   demonstrates a very -- exceptionally callous disregard

2   for human suffering. A 15 year old, Mr. Ruiz, was

3   laying down on the ground and he was being beaten by

4   two or three -- I believe it was three men, including

5   Mr. Losno and then just left there and ended up dying

6   from the injuries three days later. The motive of the

7   crime is inexplicable and very trivial in relation to

8   the offense. I -- the Panel finds it very difficult

9   to even see what the motive was except for some words

10  that were exchanged based on two opposing gangs.

11  These conclusions are drawn from the Statement of

12  Facts, wherein on June 5, 1981, Jorge Ruiz at 15 years

13  of age, body was discovered by the Daily City Police

14  Department. He had been seriously wounded by blows to

15  the head.

16          **DEPUTY COMMISSIONER STAR:** Oh, hang on

17  again.

18  [TAPE 3 SIDE 1]

19          **DEPUTY COMMISSIONER STAR:** Okay. We're back

20  on record.

21          **PRESIDING COMMISSIONER ENG:** Okay. As I was

22  stating, Jorge Ruiz's body had been discovered and

23  seriously wounded with blows to his head, possibly

24  from a baseball bat and golf clubs. A witness at the

25  scene had also been attacked with baseball bats when

26  he attempted to intervene. It was discovered after

27  **RAFAEL LOSNO   C-73252   DECISION PAGE 2   12/18/06**

121

1    investigation that four members of the Little Park

2    Street Gang from San Francisco, Mission Park District,

3    attacked Jorge, who was a member of the Daily City

4    Force Gang.  The autopsy disclosed cause of death as

5    serious injuries to the head caused by a baseball bat

6    and a golf club.  It was learned that Mr. Losno, in

7    the company of Richard Garcia and Oscar Bustamonte

8    were identified as being the assailants.  And again,

9    Jorge died three days after the assault without every

10   regaining consciousness.  Regarding Mr. Losno's

11   institutional behavior, just wanted to note that his

12   misconduct while incarcerated includes 32 128-A

13   counseling chronos, the last one being on 10/01 for

14   disobeying orders.  We recognize that there is

15   something in the C-file.

16            **DEPUTY COMMISSIONER STAR:**  A chrono that

17   seems to clarify.  It doesn't remove it but clarify.

18            **PRESIDING COMMISSIONER ENG:**  Okay.  And the

19   one before that was quite a few years earlier in

20   October of '92 for -- what's that?  Dangerous

21   (indiscernible).  Yeah, I had written something and I

22   can't quite read it.  And then in reference to serious

23   115 disciplinary reports, Mr. Losno has seven on

24   record, the last one being in November of 1988 for

25   work stoppage.  The Psychological Report, dated May 22

26   of '06 and authored by Dr. Michelle Inaba, I-N-A-B-A,

27   **RAFAEL LOSNO    C-73252    DECISION PAGE 3    12/18/06**

122

1    we find is generally supportive with the exception of
2    one area.  Where Dr. Inaba states under clinical
3    assessment, current mental status treatment needs,
4    that:
5              "He demonstrated a capacity for insight into
6              his own situation.  He can be somewhat
7              lacking in insight into the effect of his
8              decisions upon others."
9    And then later on at the end of that paragraph:
10             "He also seemed to only have a partial
11             understanding of the impact of his crime on
12             the woman who was with him at the time."
13   And after a lot of questioning, Mr. Losno admitted
14   that he really -- in terms of the causative factors
15   that led you to do what you did in sort of following
16   the others.  You had indicated to us that you had a
17   tendency to minimize some of your actions, as well as
18   it made us really wonder what was going through your
19   head in terms of just going along and ending up doing
20   this life crime.  Regarding your parole plans, sir, we
21   give you credit for having the parole plans.  However,
22   we find that some of your letters, important letters
23   are outdated and they're not specific enough.  And
24   again, the Panel highly recommends that you come into
25   your hearing with the most recent letters possible.
26   And we feel that you -- even though you have a litany
27   **RAFAEL LOSNO   C-73252   DECISION PAGE 4   12/18/06**

123

1    of support letters, to have a few very, very specific
2    letters of direct support is in your best interests.
3    In other words -- and I said this to you earlier.
4    That letters from your family that are offering very
5    specific support, such as your own room in a home,
6    what type of financial support are they going to give
7    you? Is there, you know, health -- medical/health
8    benefit support that they can provide, transportation?
9    And then also with the employment, you know, have it
10   be very recent and very specific about what these
11   potential employers are going to be hiring you for.
12   And we understand for -- you're lucky because you do
13   have people. You have family, that are offering you
14   specific jobs. Many inmates don't have that and it's
15   very, very difficult to get specific job offers while
16   you're being incarcerated. But if they could provide
17   more information and very, very specific about, you
18   know, what hours you're going to working and, you
19   know, more specifics about the jobs, et cetera. And
20   then the Panel does recognize that the outline that
21   you provided is very good. Regarding 3042 responses,
22   we do recognize that we do have a representative of
23   the District Attorney's Office of San Mateo County
24   present and he did not state that it's their position
25   to oppose parole at this time. In fact, the Office
26   was neutral on it. The Panel makes the following
27   **RAFAEL LOSNO    C-73252    DECISION PAGE 5    12/18/06**

124

1    finding.  We fell that the prisoner needs therapy, if
2    available, and any and all types of self-help that's
3    going to enable you to face, discuss, understand and
4    cope with stress in a non-destructive manner.  More
5    specifically, about the life crime and what led you to
6    it and to address more about what Dr. Inaba had stated
7    and the effect that your decisions have upon others.
8    Nevertheless, we feel -- again, progress -- until
9    progress is made, the prisoner continues to be
10   unpredictable and a threat to others.  However, the
11   prisoner should be commended for -- I know it's right
12   here -- all the -- you know, the work that you've been
13   doing with youth.  The -- obtaining your vocational
14   certificates in dry cleaning, paint and decorating and
15   we believe that you're near completion of your
16   vocational plumbing.  And also that you stated that
17   you have three more classes to go with -- to get your
18   AA degree.  And again, your participation in self-help
19   programs, such as Impact and Real Choices.  However,
20   these positive aspects of your behavior do not
21   outweigh the factors of unsuitability.  Sir, we've
22   given you a one year and it was not an easy decision.
23   And again, the -- you know, we recommend that you
24   remain disciplinary free.  That if available, that you
25   continue to upgrade vocationally and educationally.
26   And that if available, you continue to participate in
27   **RAFAEL LOSNO    C-73252    DECISION PAGE 6    12/18/06**

125

1    self-help and in any type of therapy programming.

2    That basically concludes the reading of the Decision.

3    And I'm going to ask Commissioner Star if she has any

4    additional comments to make.

5         **DEPUTY COMMISSIONER STAR:**  No, I -- well,

6    two.  I want to also reaffirm what Commissioner Eng

7    said about your accomplishments.  Truly outstanding

8    group participation, self-help groups, contributing to

9    the outside from inside.  A lot of self-development

10   here in terms of the vocations and education and

11   outstanding.  I also though believe that there needs

12   to be more insight into your role in this commitment

13   offense, as well as your initial gang affiliation

14   inside the institution for the initial years.  I think

15   the insight in that is still lacking and you could

16   benefit from a better understanding of that.

17        **PRESIDING COMMISSIONER ENG:**  Okay.  We wish

18   you luck, sir.  The time is now 4:34.

19        **ATTORNEY FOX:**  Will there be a new

20   psychological evaluation, inasmuch as you relied on

21   the comments of Dr. Inaba?

22        **PRESIDING COMMISSIONER ENG:**  We didn't order

23   one because we found that it was generally supportive

24   except for those two areas.  And that's why we asked

25   him to continue with his self-help and to be able to

26   address that.

27   **RAFAEL LOSNO   C-73252   DECISION PAGE 7   12/18/06**

126

1              **ATTORNEY FOX:**  And how would you know if he
2     doesn't have an evaluation.
3              **PRESIDING COMMISSIONER ENG:**  Well --
4              **DEPUTY COMMISSIONER STAR:**  Because it's --
5     if I can -- if I may, Commissioner Eng?
6              **PRESIDING COMMISSIONER ENG:**  Yes.
7              **DEPUTY COMMISSIONER STAR:**  It's really based
8     on Mr. Losno's explanations of his commitment offense
9     and his gang affiliation.  That's what the decision
10    makers made the decision on today.  It was only
11    partially reinforced by the doctor's report.  Some --
12    there was a comment or two in there but it was mostly
13    came from Mr. Losno's statements.  Is that accurate?
14             **PRESIDING COMMISSIONER ENG:**  That's correct.
15    That's correct.
16             **DEPUTY COMMISSIONER STAR:**  Okay.  Going off
17    record.
18             **ATTORNEY FOX:**  Thank you.
19                        --o0o--
20
21
22
23    **PAROLE DENIED ONE YEAR**        **APR 1 6 2008**
24    **THIS DECISION WILL BE FINAL ON:**_____
25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO**
26    **THAT DATE, THE DECISION IS MODIFIED.**
27    **RAFAEL LOSNO   C-73252   DECISION PAGE 8   12/18/06**

127

## CERTIFICATE AND DECLARATION
## OF TRANSCRIBER

I, TAMA BRISBANE, the owner of House of Scribes, have designated ANNA E. McGAUGHY, a duly designated transcriber with House of Scribes residing in the State of Pennsylvania, to prepare the foregoing transcript. With my signature I do hereby declare and certify, under penalty of perjury, that I have directed her to transcribe tape(s) that total three in number and cover a total of 129 pages. The recording was duly recorded at CALIFORNIA DEPARTMENT OF CORRECTIONS, SAN QUENTIN STATE PRISON, SAN QUENTIN, CALIFORNIA, and the foregoing pages constitute a true, complete and accurate transcription of the aforementioned tape to the best of her ability.

I hereby certify that House of Scribes and its designated transcribers are disinterested parties in the above-captioned matter and have no interest in the outcome of the proceeding.

Dated March 27, 2007 in Stockton, California.

_Tama Brisbane_

Owner, House of Scribes

EXHIBIT "B"

LOSNO, Rafael  C-73.                                           May 22, 2006

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# JUNE 2006 LIFER HEARING
# SAN QUENTIN STATE PRISON

## PSYCHOSOCIAL ASSESSMENT

1.      Identifying Information:    Mr. Losno is a 44-year old, Latin male who is serving a
15-Year to Life sentence for Second Degree Murder (P187), committed on May 5,
1981. The report is based on a review of the inmate's central files, medical record
and a face-to-face interview conducted in the staff offices of San Quentin State
Prison. Mr. Losno was informed of the limits of confidentiality in that information
provided would be included in a report to the Board of Prison Terms. Mr. Losno
stated that he understood this and was able to demonstrate an understanding of the
purpose of the interview. He denied any need for assistance or for any adaptive aides
and stated that he was fully able to participate in the interview. Only Mr. Losno and
the examiner were present at the interview.

Mr. Losno' developmental history, family history, psychosocial development and sexual
orientation, military history, educational history, employment and income history, and
substance abuse history have been thoroughly reviewed and presented in previous reports and
will not be repeated here. The reader is referred to the October 5, 2004, report by Dr.
Goldyne for this information.

II.    Plans if Granted Release:
Housing:
Mr. Losno plans to reside with family members if paroled to the community. He has housing
offers from two sisters who live in San Mateo County. His father lives in San Lorenzo and
has also offered to help him.

Employment:
Mr. Losno plans to work as a translator or in building construction. He has a letter of support
offering employment as a translator with a tax accounting business. He has also been
contacted by the San Mateo County police department about working with their youth
programs. Mr. Losno states that he is sure that he will "be an asset out there."

Social Support/Services:
Mr. Losno describes his father as his "best friend." He and his father have become close
during his incarceration and he feels that his father is fully supportive of him. His father is

LOSNO, Rafael  C-73.                                                      May 22, 2006

retired and plans to travel to the countries from which his family originated. He has offered to take Mr. Losno with him on this trip. Mr. Losno states that he has encouraged his family members to enjoy their lives as they spent many years with their lives on hold because of his offense. Mr. Losno is in contact with his daughters who visit him with his grandchildren. He hopes to be more involved in the raising of his grandchildren than he was able to be with the raising of his daughters.

## CLINICAL ASSESSMENT

III. Current Mental Status/Treatment Needs:

Mr. Losno appeared to be his stated age. His appearance was remarkable for coal black hair and graying mustache. He is a very muscular man of average stature for his ethnicity. He was immaculately groomed and dressed in neatly pressed CDC inmate clothing. He appeared to be fully alert, and was oriented in all spheres. His thought was coherent, linear and logical with no evidence of thought disorder. His intellectual functioning appeared to be in the average range. Speech and flow of thought were within normal range. He is very expressive verbally and can speak spontaneously at some length. There was no evidence of mood instability or depressed mood. His judgement appeared to be adequate for most situations. He demonstrated capacity for insight into his own situation. He can be somewhat lacking in insight into the effect of his decisions upon others. He remarked that he had been engaged to a woman and that his daughters became upset about this relationship. They pointed out to him that they had suffered a great deal because of his absence and felt they should be given more consideration in his life. He was able to understand this after it was pointed out to him. He also seemed to only have a partial understanding of the impact of his crime on the woman who was with him at the time.

### CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | V71.09  No Diagnosis |
| | V71.02  Adolescent Antisocial Behavior (by history) |
| AXIS II: | V71.09  No Diagnosis (narcissistic personality traits) |
| AXIS III: | None acute or affecting mental health |
| AXIS IV: | Stressors:  Life Sentence |
| AXIS V: | GAF = 78 |

III.    Assessment of Dangerousness:

The following is a risk assessment and not intended to predict future dangerousness with complete accuracy. A risk assessment is based on enumeration of factors found to be statistically associated with a greater likelihood of violent behavior. Some individuals found to have a rating of low risk for violence, become violent, while individuals who have factors suggesting high risk for violence, may never commit a future violent act.

LOSNO, Rafael  C-73.

May 22, 2006

## A. In a Controlled Environment:

Mr. Losno has been disciplinary free since 1988. Mr. Losno had previously been identified as a Northern Structure member while in CDC. He denies that he was ever a Northern Structure member and states that he only assisted other gang members in non-violent activities such as handling mail. While he was an inmate at Pelican Bay, he witnessed violent assaults and stated that "that's when I cut. I decided that I was not going to be a part of this." According to Mr. Losno when approached to do a "hit" on another inmate, he refused resulting in his being stabbed while showering. He denies that he knows who stabbed him. His institutional record has been free of violence. Based on his institutional record and clinical presentation, he would be a low risk for violent behavior in a controlled environment.

## If Released to the Community:

Prior to his commitment offense, Mr. Losno's only other offenses were Dumping Offensive Material (urine) and Resisting a Public Officer in 1981. He stated that the incident occurred when police attempted to break up a rowdy gathering of youth. He felt that the police were mistreating his girlfriend and resisted the officer's order to have him face the wall. He was hit by the officer with a billy club, and stated that "the police beat me up."

Other than his commitment offense, Mr. Losno has no history of violent criminal behavior in the community. He was never involved with the Court as a juvenile, and had no history of property crimes. He stated that his grandfather provided material things for him that he wanted, so that he never felt a need to steal. He stated, "My grandfather spoiled me."

Mr. Losno denied ever being physically abused in his family. He stated that his father taught him by example, rather than punishment. Mr. Losno stated that his parents argued and physically fought prior to their separation as a couple. He believes that his father would hit his mother, although he never saw his mother with injuries, and never observed his father beating his mother. He acknowledged that he was possessive and jealous while he was dating the mother of his children, as she was very attractive. He admits to striking her while they were dating. He stated that he loved her very much, and that there was possessiveness and jealousy on both sides. He denied being habitually abusive.

Mr. Losno has no history of involvement with guns in the community. His family did not own guns or use them for sport or target shooting. When describing his relationship to guns, Mr. Losno stated, "I'm afraid of them really."

Mr. Losno' background has very few factors associated with violent recidivism. He is a male with a history of alcohol use, and some intermittent abuse of alcohol. He had no record of alcohol or drug related offenses. He also had no history of violent crime or failure on supervised release. He does not view himself as a victim although he acknowledged being assaulted by other inmates. He has no recent history of loss of control or impulsive behavior. He does not have any psychiatric illness or paranoid delusions.

While he has some personality traits that are maladaptive, such difficulty identifying with the feelings and needs of others, they are not severe enough to cause him distress, or impairment of functioning. His POR described him described him as presenting "little real danger to the community at the time of his arrest." He was also described as a "dependable and helpful son." Within the context of his family, he was a non-violent individual. He was caught up in gang conflict that was confrontational and if necessary, violent. This is substantiated by the fact that he and the other youth had items that could be used as weapons in the car with them, on the day of the offense. The POR also indicated a pattern of gang confrontations in that geographical area.

Mr. Losno is now a 44-year old man, it is hard to conceive of him being involved in the type of activity that led to his crime. He has backed away from gang involvement while in prison. There would be little incentive for him to realign himself with a violent organization, unless his involvement was different from what Mr. Losno has consistently presented.

Mr. Losno has continued to compile an impressive record of positive programming since his last consideration by the Board. While he is involved in a number of self-help, educational and volunteer efforts, he still carries the demeanor of a man who has spent many years incarcerated. One legacy of this experience is that Mr. Losno's personality structure is somewhat self-absorbed and self-serving. A review of his institutional record suggests that this may be the result of his years of incarceration as a Level IV inmate. He came into prison as a very young man, with no previous correctional experience. He was able to adapt through gang affiliation, and apparently has been able to move beyond that experience into more positive programming. Since his arrival at San Quentin, he has involved himself extensively in self-help and educational activities. He has also continued substance abuse intervention through participation in Overcomer's Outreach since 2003. Mr. Losno plans to continue to be involved with violence and crime prevention programs if released to the community. He sees himself as continuing his engagement with at-risk youth through volunteer work or employment. He has also remained in contact with his social support network in the community.

V. Clinician Comments and Summary:

1. Mr. Losno's account of his use of alcohol and/or drugs does not differ from the account contained in Dr. Goldyne's 2004 report. Mr. Losno understands that alcohol would be available at social gatherings in the community and that he would be encouraged by others to consume. He is also aware that he does not have a family history that is positive for alcoholism or drug addiction. He would anticipate the support of family members and friends in maintaining his abstinence.

2. While Mr. Losno acknowledges that he and his friends consumed alcohol and mescaline on the day of his offense, the crime seemed to be more an expression of youth gang values and culture. While it is likely that the event was *fueled* by the use of intoxicants, there is no reason to believe that the consumption of drugs or alcohol was a causative factor. The ages of the participants was also a significant factor.

LOSNO, Rafael  C-73.                                                May 22, 2006

3.  Mr. Losno has a realistic parole plan, as well as offers of financial and social support in the community from his family members. He is also open to involvement with agencies that provide help to parolees. He is willing to continue his involvement in substance abuse prevention.

4.  Given Mr. Losno's lack of prior criminal involvement in the community, any risk of future violence would not appear to be related to violent crime. It would be beneficial for Mr. Losno to engage in counseling with any romantic partner in order to ensure that he does not repeat the interpersonal violence that was part of his parent's marriage. Because of his lengthy incarceration, he has not had the opportunity to master adaptive relationship skills.

5.  As the crime was largely developmental and situational in nature, the use of alcohol and/or drugs was only one contributing factor in the offense. However, Dr. Goldyne's recommendation that the possibility of drugs and alcohol as a factor in the crime warrants continued participation in twelve-step program, is a sound one. It applies equally to any risk of interpersonal violence.

The present examiner also agrees with Dr. Goldyne's conclusion that given his crime and his institutional record, Mr. Losno would be at low risk for violent recidivism compared to members of the inmate/parolee population. Comparing Mr. Losno's risk of future violent behavior to members of society who have no history of substance abuse, violence, or incarceration however, may be like comparing apples to oranges. Based on his exposure to violence in prison, Mr. Losno would be expected to be both better able to formulate a violent response, if needed, and also more skilled at avoiding violence than individuals with less exposure. Mr. Losno's institutional record would suggest that he is highly adept at avoiding violence in almost any situation. This would suggest that with the maintenance of abstinence, and denunciation of gang affiliation, he would be at low risk for violent recidivism in the community.

The Board members and others reading this document should be aware that this assessment is an opinion based on the examiner's clinical training and experience, and a review of the available data. It does not claim to be a standardized, validated assessment that would yield a result that would be ranked as low, medium or high in regard to the likelihood of future violence.

Michel Lynn Inaba, Ph.D.                                    5-22-06
                                                            Date

Dr. Shaba,

I write you this short note to remind you, about some clarification regarding the psych report you wrote. I hope you remember my name. Rafael A Losno C-73252. We also spoke briefly on the stairs, leading down to the lower yard. My lawyer, and I were very pleased with the report. However. My lawyer, asked me to speak to you regarding some confusing remarks. She's asking. How do these statements apply to me? We don't really understand them

On page (2) for example. "what instances lead you to believe, I lack insight into the effect of my decisions on others, besides my daughters' concern about my former fiancée? And on page (4) what personality traits are maladaptive, and how can I improve? Can you please, just expand on these statements. I would appreciate it very much.

Thank you

Rafael Losno

TO:      Rafael Losnos, C73252

FROM: M. Inaba, Ph.D.
         CDC Contract Psychologist

DATE:  August 1, 2006

RE:      Attached letter (no date)

I hope that the following clarifies some questions you had about your most recent
psychological evaluation for the Board of Prison Terms. "Maladaptive personality traits"
are refers to an enduring pattern of inner experience or behavior that makes it difficult for
a person to optimally respond to a situation. It is not a mental disorder and everyone has
some maladaptive traits. As some people say, our greatest strength can also be our
greatest weakness. An example might be someone who is very good at saving money,
might also be someone who is therefore less generous than others.

People who are somewhat narcissistic tend to think well of themselves, but tend to be less
tuned into the needs of others. Ideally we would all be in the middle on these qualities or
traits, but we are not. This means, as you suggested, that we all have the need to work on
the areas in which we might improve. For a person who tends to see himself, or herself
as having few flaws a way of improving might be to consciously put someone else's
interests ahead of their own and to practice doing this. For a period of time, with each
action or decision, think "how would this impact (wife, child, friend, etc.) and then
decide in that person's favor.

Overall, I'm sure your attorney found the report to be very positive.

Cc: M. Lyons, Senior Psychologist, San Quentin

EXHIBIT "C"



U.S. POSTAGE
PAID
SAN QUENTIN, CA
94964
MAR 0 4 '08
AMOUNT
$0.00
00022457-04
94102






0000

420 94102000 99 1000



RECEIVED

MAR 1 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483



Rafael A. Losno Jr
C-13252/2-N-65L
San Quentin S.P.
San Quentin Ca.
94974

LEGAL MAIL